Monica Fabbi, ISB No. 10018
mfabbi@ifhcidaho.org
**INTERMOUNTAIN FAIR HOUSING COUNCIL**
4696 W Overland Rd, Ste 140
Boise, ID 83706
Tel: (208) 383-0695
Fax: (208) 383-0715

Alyson A. Foster, ISB No. 9719
alyson@bdfcounsel.com
Taylor J. Long, ISB No. 11966
tlong@bdfcounsel.com
**BJORKMAN DEMPSEY FOSTER PLLC**
714 W. State Street
Boise, ID 83702
Tel: (208) 401-9533
Fax: (855) 940-1879

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JANE DOE, an individual; KELLY DOE, an individual; JOHN DOE, an individual; and DOES I-X, | Case No. |
| Plaintiffs, | |
| v. | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| THE UNIVERSITY OF IDAHO, a public university, | |
| Defendant. | |

Plaintiffs Jane Doe ("**Jane**"), Kelly Doe ("**Kelly**"), and John Doe ("**John**"), through their

undersigned counsel of record, complain against the defendant the University of Idaho, a public

university governed by the State Board of Education also known as the Board of Regents of the

University of Idaho, a constitutional corporate body, as follows:

COMPLAINT AND JURY DEMAND – 1

## I.   <u>NATURE OF THE ACTION</u>

1.      The University of Idaho College of Law is the only law school in Idaho. Any student who wants to study law in Idaho has only one choice: to attend the University of Idaho College of Law.

2.      The University and its law school claim to welcome a diverse body of students and provide a safe learning environment for all races, ethnicities, and sexual orientations. The law school website explicitly recruits students of diverse backgrounds and promises a respectful learning environment:

> The University of Idaho College of Law welcomes law students, staff and faculty from all cultures, races, ethnicities, genders, physical abilities, lifestyles, opinions, nationalities, philosophies, sexual orientations, religious backgrounds, ages, life experiences and identities, and strives to abolish educational inequity. We believe that increasing the diversity of our organization is pivotal in order for us to benefit from the talent and energy of everyone.
>
> Diversity and inclusion are essential components at the UI College of Law, and we require legal professionalism from all sectors of our community to provide a respectful learning environment.

3.      The law school benefits from a diverse student body, in its own words, to "benefit from the talent and energy of everyone." The law school also benefits financially: it receives over half of its funding from federal grants and monies that prohibit discrimination and, in some instances, require recruitment of diverse populations.

4.      As a recipient of federal money, the University is required to adhere to nondiscrimination policies in their treatment of all students. The University is required, for example, to investigate and address discrimination that threatens the learning experience and safety of their students.

5.      The University and its law school systematically fail to honor their obligations to treat students in a nondiscriminatory fashion.

COMPLAINT AND JURY DEMAND – 2

6.      Plaintiffs are students and former law students of the College of Law who suffered discriminatory treatment by the University, its staff, and other students to such a degree that they ultimately fled Idaho for their safety.

7.      Each Plaintiff is or is perceived to be a member of the LGBTQIA+ community. Two are persons of color. Each has disabilities. The University of Idaho College of Law, through its failures and actions, discriminated and retaliated, and continues to discriminate and retaliate, against Plaintiffs based on their sex (LGTBQIA+ status), race, color, national origin, and/or disabilities. The University of Idaho contributed to creating an unsafe environment for Plaintiffs, which ultimately drove them to flee the University community and the state to protect themselves. Now, Plaintiffs Kelly and John attend school on an entirely remote basis and Plaintiff Jane transferred to a different law school altogether. The University continues to discriminate against Kelly and John by, among other things, refusing to provide federally mandated reasonable accommodations for their disabilities, including disabilities created by the University itself.

8.      In this action, Plaintiffs seek to rectify the harm they have suffered and to obtain relief that would protect other students. Plaintiffs bring this action for declaratory judgment, permanent injunctive relief, and damages based on violations of the following laws:

      a.      Fair Housing Act, 42 U.S.C. §3601 et seq. ("**FHA**"), and in particular:

          i.   Making housing unavailable, 42 U.S.C. § 3604

          ii.   Interference, coercion, or intimidation, 42 U.S.C. § 3617;

          iii.  Fair Housing Regulations, 24 C.F.R. § 100 et seq.;

      b.      Title IX of the Education of Amendments of 1972, 20 U.S.C. § 1681(a) ("**Title IX**");

      c.      Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. ("**Title VI**");

d.   Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. ("**ADA**");

e.   Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794;

f.   The 14th Amendment of the United States Constitution through 42 U.S.C. § 1983;

g.   Breach of Contract; and

h.   Unjust Enrichment.

9.     In sum, Plaintiffs seek compensation for the damages caused by Defendant's discriminatory and negligent actions, declaratory relief, and injunctive relief to enforce the prohibition of such behavior from continuing towards other students at the University of Idaho College of Law.

## II.     JURISDICTION AND VENUE

10.     As to Plaintiffs' federal claims, this Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 (original jurisdiction of all civil actions arising under the Constitution and laws of the United States), 2201 and 2202 (declaratory relief); 42 U.S.C. § 3613, 3617, and 3631 (FHA claims).

11.     This court has supplemental jurisdiction over other claims in this case pursuant to 28 U.S. Code § 1367(b) because they share the same nucleus of fact as claims with which the court has original jurisdiction.

12.     Venue is proper with this Court as the University of Idaho resides within the jurisdiction of the Court (28 U.S.C. § 1391(b)(1)), and a substantial part of the events or omissions giving rise to the claims occurred within the jurisdiction of the Court (28 U.S.C. § 1391(b)(2)).

## III.     THE PARTIES

13.     All Plaintiffs proceed under fictious names to protect themselves from harassment, injury, ridicule, and/or personal embarrassment. Special circumstances justify the secrecy of their

identities in this lawsuit. As detailed in this Complaint, each Plaintiff was intimidated, assaulted, and/or harassed, and fled Idaho based on fears for their safety. At least one Plaintiff's student records were illegally released by a University staff member to a hostile third party without that Plaintiff's permission. Plaintiffs therefore remain fearful for their physical safety as well as of harassment of themselves and their family members if their identities are made public in connection with the allegations and claims brought in this lawsuit.

14.     **PLAINTIFF JANE DOE** ("**Jane**") is a third-year law student and identifies as LGBTQIA+. Jane attended the University of Idaho College of Law from August 2021 until July 2022. She chose that school based on its affordable tuition, its proximity to her mother's home in northern Idaho, and its assertions of inclusivity and anti-discrimination stance. Jane resided in Idaho for much of the relevant time in this lawsuit and currently resides in the State of Washington. She is expected to graduate in May 2024. Jane fled Idaho in or around April of 2022 and transferred to Seattle University Law School in August 2022. Jane has medical disabilities. Because of the traumatic events and discriminatory treatment she experienced at and by the University, Jane's disabilities were exacerbated to the point she required classroom and testing accommodations to allow her to learn at the same rate as other law students without disabilities at a location off-campus.

15.     **PLAINTIFF KELLY DOE** ("**Kelly**") is a third-year law student at the University of Idaho College of Law. Kelly identifies as, and/or is perceived to be, LGBTQIA+. Kelly is a person of color and identifies as black or African American. She resided in Idaho for much of the relevant time and currently resides in the State of Washington. Kelly is currently enrolled as a law student at the University of Idaho College of Law, and attended classes in Moscow, Idaho in the 2021-2023 school years. Kelly fled Idaho in or around January 2023 and is currently attending

classes remotely from another state. As a result of the defendant's conduct, Kelly developed and has been medically diagnosed with specific disabilities that negatively affect her ability to learn at the same rate as other students that do not have disabilities. Kelly's disabilities are correlated with and some result from the traumatic events and discriminatory experiences she endured while attending the University.

16.     **PLAINTIFF JOHN DOE** ("**John**") is a third-year law student at the University of Idaho College of Law. John is a Pacific Islander student with disabilities who identifies as LGBTQIA+, practices Hinduism, and has brown skin. John joined the University of Idaho College of Law through a diversity program called Council on Legal Education Opportunity (CLEO), a 501(c)(3) national non-profit organization founded in 1968 to expand opportunities for underrepresented students to attend law school. The University of Idaho College of Law is a CLEO Consortium Partner Law School. John resided in Moscow, Idaho during his second year of law school. John fled Moscow in or around May 2022 to Arizona, where he currently lives. He now attends classes held at the Boise, Idaho, campus, remotely through the Student in Practice ("**SIP**") program, through which remote attendance is the custom and only option for SIP students. John anticipates graduating with his Juris Doctorate in December 2023. John has been medically diagnosed with disabilities that affect his ability to learn at the same rate as other students that do not have disabilities.

17.     Both John and Kelly are students of color and are classified as members of an underrepresented community attending the College of Law as a minority student. Kelly is one of only two black students in her graduating class of Spring 2024. John is the only Pacific Islander in his graduating class of December 2023.

18.     Jane, Kelly, and John were all members of the student organization OUTLaw which supports LGBTQIA+ law students in addition to law students who have family and friends in the LGBTQIA+ community. Because of their involvement in OUTLaw, other law students were aware that Jane, Kelly, and John are part of the LGBTQIA+ community.

19.     **DOES I-X** are individuals who, on information and belief, experienced the same or similar conduct at the University as that experienced by one or more of the Plaintiffs but whose identities are currently unknown. The true names of Does I through X will be provided once their identities are known.

20.     **DEFENDANT THE UNIVERSITY OF IDAHO ("University of Idaho")** is an accredited university located at 875 Perimeter Dr., Moscow, ID 83844. The University of Idaho encompasses the surrounding property and identifies the surrounding community of Moscow, Idaho, as its "university community." The University of Idaho was and is a corporate and political body organized and existing under the laws of the state of Idaho. The University of Idaho is in the business of selling and renting dwellings and, within the preceding 12 months, has participated as a principal in three (3) or more transactions involving the sale or rental of dwellings. As such, the University of Idaho is a "covered provider" within the meaning of the FHA.

21.     At all times material to this Complaint, the University of Idaho was operating an educational program or activity receiving federal financial assistance, bringing it under the requirements of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681, the Americans with Disabilities Act, 42 U.S.C. § 12182, and the Rehabilitation Act, 29 U.S.C. § 794(a).

## IV.     FACTUAL ALLEGATIONS

**A.     To Benefit from Federal Funding, the Law School Purports to Create a Respectful and Non-discriminatory Learning Environment for Students of Diverse Backgrounds and Identities**

22.     The University Idaho College of Law University ("**College of Law**" or "**Law School**") located at 711 S. Rayburn St., Moscow, Idaho, 83844, is an unincorporated entity accredited by the University of Idaho and the American Bar Association ("**ABA**") to provide legal training for prospective lawyers.

23.     The Law School conducted and continues to conduct law classes in Moscow, Idaho; in Boise, Idaho; and online for students attending remotely.

24.     As a recipient of federal financial assistance from the U.S. Department of Education, the University must operate the Law School in a nondiscriminatory manner free of discrimination based on sex, including sexual orientation and gender identity. The Law School's Title IX obligations extend to, among other things, the areas of recruitment, admissions, counseling, treatment of LGBTQIA+ students, and discipline. The Law School's Title VI obligations extend to these areas and require the University to not discriminate based on race, color, and national origin.

25.     The school maintains an Office of Civil Rights & Investigations ("**OCRI**") responsible for ensuring compliance with federal and state laws related to discrimination or harassment based on a protected class, including Title VI and Title IX. Any person who experiences or observes any form of discrimination or harassment based on a protected characteristic may file an informal or formal complaint with OCRI. Protected characteristics include race, color, religion, national origin, age, protected military status, age, disability, family status, genetic information, creed or sex-based discrimination that includes pregnancy, parenting, sexual orientation, or gender identity or expression.

COMPLAINT AND JURY DEMAND – 8

26.     When a report is made, OCRI reviews the initial report using a "team of investigators specially trained to investigate reports of sexual violence, discrimination, harassment, and retaliation." The investigators may conduct initial interviews and collect information. OCRI may determine that the information presented does not constitute a policy violation or that insufficient evidence exists to continue the investigation. Or OCRI may continue the investigation by providing formal notice of investigation to the complainant and respondent. OCRI then will conduct interviews with potential witnesses and pertinent individuals. OCRI reviews all information gathered and generates a report. Both parties are provided an opportunity to review the draft report for final comment.

27.     One of the laws OCRI administers at the University is Title IX. Title IX provides protection for students in connection with all academic, educational, extracurricular, athletic, and other programs of the school. This includes school-related events and applies all year. It also covers activity that occurs off school grounds if there is carryover into the educational setting. For example, the University's website gives such an example: "if a student is sexually assaulted off-campus by another student and must continue to interact with or see the other student on campus." It applies to "any location or any time of the year."

28.     University employees, including Law School staff and professors, are mandatory reporters and must report behavior or incidents that may be prohibited under Title VI, Title IX, or other applicable laws or policies.

29.     In its marketing, the University of Idaho includes data about the racial and gender diversity of its student body. *See, e.g.*, https://www.uidaho.edu/-/media/UIdaho-Responsive/Files/law/academics/law_fast-fact_sheet.pdf.

30.     The University of Idaho's Faculty-Staff Handbook ("**FSH**") contains the Student

Code of Conduct and Resolution Process ("**Code**") (FSH 2300). The Code provides:

   a.  The Code applies to conduct that occurs on University property, within or at University-sponsored activities, off campus, online, or through other electronic means. Code § C-2(a).

   b.  Disciplinary action may also be taken for any violation of local ordinances, state, or federal law, or on or off campus conduct.

31.     In 2021 and 2022, the Code forbade threats of harm or actual harm to a person's

physical or mental health:

> Threat of Harm or Actual Harm to a Person's Physical or Mental Health or Safety. Living together in a university community requires respect for the rights of fellow members of that community to pursue their academic goals and to participate in lawful campus or University activities. As in any community, certain forms of responsible conduct must be adhered to in order to ensure the physical functioning and safety or security of that community.

Code § E-4.

32.     In the 2021-2022 school year (i.e., prior to amendments implemented in August

2023), the Code included the following provision addressing physical violence:

   a.  Physical violence of any nature against any person, on or off campus. Physical violence includes, but is not limited to, (i) fighting; (ii) assault; (iii) battery; (iv) the use of a knife, gun, or other weapon except in reasonable self-defense; (v) physical abuse; (vi) restraining or transporting someone against his/her will; or (vii) any action that threatens or endangers the physical health or safety of any person or causes reasonable apprehension of such harm.

   b.  Persistent or severe, verbal abuse, threats, intimidation, harassment, coercion, bullying, derogatory comments, vandalism, or other conduct that threatens or endangers the mental or physical health or safety of any person or causes reasonable apprehension of such harm. A single instance may be considered severe enough to merit sanctions.

   c.  Sexual harassment, which is defined as unwelcome conduct of a sexual nature (see FSH 3205 for the requirements of the consensual relationship policy). It includes, but is not limited to, unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or

physical conduct or communication of a sexual nature when: (1) Submission to or rejection of such conduct or communication is a term or condition of educational benefits, employment, academic evaluations, or other opportunities; (2) Submission to such conduct or communication has the purpose or effect of substantially interfering with a student's education; (3) <u>Such conduct is sufficiently severe or pervasive as to have the effect of creating an intimidating, hostile or offensive educational environment or negatively affecting a student's educational opportunities</u>. A single instance may be considered severe enough to merit sanctions.

d.  Gender-based and sexual orientation harassment . . . , which is defined as any act of <u>verbal, non-verbal, or physical aggression</u>, intimidation, or hostility based on sex, sex-stereotyping, gender, or gender-stereotyping, even if those acts do not involve conduct of a sexual nature.

e.  Discrimination and Retaliation. a. Discrimination, which includes conduct that violates the Board of Regent's or the University's nondiscrimination and antidiscrimination policies contained in FSH 3200, 3210, 3215 and RGP III.P.1.

f.  Retaliation, which includes <u>conduct that intimidates, interferes with, threatens, coerces, or otherwise discriminates against any individual because that individual opposes or reports a perceived wrongdoing, inequity, or violation of law or University policy, files a complaint alleging illegal or prohibited discrimination, participates in a grievance or appeals procedure, or participates in dispute resolution.</u>

(Emphasis added.)

33.     At all times relevant, the University published a non-discrimination policy on its

website (FSH 3200):

The University of Idaho has a policy of nondiscrimination on the basis of race, color, religion, national origin, sex, sexual orientation, gender identity/expression, age, disability or status as a Vietnam era veteran. This policy <u>applies to all programs, services, and facilities, and includes, but is not limited to, applications, admissions, access to programs and services</u>, and employment.

Such discrimination is prohibited by titles VI and VII of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, sections 503 and 504 of the Rehabilitation Act of 1973, the Vietnam Era Veterans' Readjustment Assistance Act of 1974, the Pregnancy Discrimination Act of 1978, the Age Discrimination Act of 1975, the Age Discrimination in Employment Act Amendments of 1978, the Americans With Disabilities Act

COMPLAINT AND JURY DEMAND – 11

of 1990, the Civil Rights Act of 1991, the Rehabilitation Act Reauthorization of 1992, other state and federal laws and regulations and university commitments.

Sexual harassment violates state and federal law and policies of the Board of Regents, and is expressly prohibited. The University of Idaho also prohibits discrimination on the basis of sexual orientation and gender identity/expression.

(Emphasis added.) Portions of this are also excerpted in the Law School's Student Handbook.

34.     At all times relevant the University had an express Sexual Harassment Policy (FSH

2400) also published on its website:

Sexual harassment of a student is defined as unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature when: (a) submission to such conduct is made either explicitly or implicitly a term or condition of the student's grade, receipt of a grade, or status as a student; (b) the student's submission to or rejection of such conduct is used as a basis for a decision affecting that student; or (c) such conduct has the purpose or effect of substantially interfering with the student's learning or learning performance, or creating an intimidating, hostile, or offensive learning environment.

(Emphasis added.)

35.     At all times relevant the University had express Reporting and Sexual Harassment

Policy within its Ethics policies:

**REPORTING UNETHICAL BEHAVIOR.** As state employees, UI faculty and staff recognize their responsibility to report unethical behavior when it is encountered. UI employees can confidentially report concerns about suspected issues of illegal, unethical or irresponsible acts.

**Discrimination and Sexual Harassment.** The university must strive to maintain a learning and working environment that is safe, supportive, and responsible. Discrimination and sexual harassment toward any member of the university community violates federal and state laws and the policies of the University of Idaho. See FSH 3200, 3210, 3215, and 3220. Incidents of discrimination and sexual harassment should be reported to the appropriate university administrator identified in the policies.

(Emphasis added.)

COMPLAINT AND JURY DEMAND – 12

36.     The Law School has a College of Law Nondiscrimination Policy which it also

publishes on its website:

> The University of Idaho College of Law prohibits discrimination on the
> basis of race, color, religion, ethnicity, national origin, sex, sexual
> orientation, gender identity/expression, age, disability, military status, or
> status as a Vietnam era veteran. This policy applies to all programs,
> services, and facilities including, but not limited to, applications,
> admissions, access to programs and services, and employment.

37.     The Law School has a Student Handbook that applies to students both on and off

campus. The 2021-2022 Law School Student Handbook addressed how students, faculty, and staff

must treat each other:

> The College of Law holds its students, faculty, and staff to high professional
> standards, which include the obligation to treat all persons with dignity and
> respect. Those in the legal profession have a professional obligation not
> only to treat others with civility, but also to develop cultural competencies
> and guard against cognitive and other biases. Discrimination and
> harassment in all their forms not only violate students' professional
> obligations as future lawyers but also College and University policies, and
> they may violate state and federal law as well.

38.     The 2021-2022 Law School Student Handbook contained the College of Law

Diversity Statement:

> At University of Idaho College of Law we embrace diversity within our
> College community and the legal profession by protecting and fostering an
> inclusive and respectful learning environment for the discussion of legal
> principles, concepts, and practical skills. As a preparatory ground for future
> practitioners of the law, we adhere to high standards of legal
> professionalism within our classrooms, our offices, our hallways, our
> student organizations, our gathering places, and our activities. The calling
> to law is an important one with significant impacts on society, and as a
> College we take that significance to the core of our purpose. By all members
> of the College being able and willing to listen respectfully to each other's
> viewpoints and to participate in discussions in a calm, professional, and
> civil manner, we strive to abolish educational inequity stemming from
> disparate treatment. We welcome and value law students, staff, and faculty
> from all cultures, races, ethnicities, genders, physical abilities, lifestyles,
> opinions, nationalities, philosophies, sexual orientations, religious
> backgrounds, ages, life experiences, and identities. Diversity is an essential
> component of the College and requires legal professionalism from all

sectors of our community to provide an appropriately respectful learning environment.

39.    The 2021-2022 Law School Student Handbook contained the College of Law

Diversity & Inclusion Resolution, which is also published on the Law School's website:

> WHEREAS, the College of Law is committed to nondiscrimination consistent with the University of Idaho's official policy of nondiscrimination, including, but not limited to nondiscrimination on the basis of race, color, religion (creed), national origin (ancestry), ethnicity, sex, age, sexual orientation, gender identity/expression, pregnancy, disability, marital or family status, genetic information, or veteran or military status, and
>
> WHEREAS, the Mission of the University of Idaho College of Law is to provide access across all cultures and ideologies to the highest quality of legal education, to lead the region in promoting civil discourse on concerns of policy and law, to provide legal service to underserved populations, and to contribute to the local, regional, national, and international scholarly dialogue on issues of critical importance in our time, and
>
> WHEREAS, to fulfill that mission, we must have uncomfortable and transparent conversations about racial injustice and take constructive actions to make meaningful progress toward societal change, and
>
> WHEREAS, we all have an obligation and must commit to doing better at embracing our differences and the power that diversity represents and at standing with all those who experience racial prejudice as effective allies;
>
> THEREFORE, BE IT RESOLVED THAT the College of Law commits to:
>
> • Condemn and seek to end racism and all other forms of discrimination against those referenced above;
>
> • Teach our students to engage in critical and constructive dialogue surrounding issues of racism and discrimination;
>
> • Actively encourage and advocate for policies to support the students, staff, faculty and others affected by racism, discrimination, oppression, injustices, and inequities inherent in our institutional systems;
>
> • Continuously strive to accord respect and equitable treatment to all;
>
> • Ensure our students, staff, and faculty feel secure and institutionally supported in the environment we have the responsibility to create.

40.     In July 2020, the Law School signed the ABA's Disability Diversity in the Legal

Profession: A Pledge for Change, published on the Law School's website:

> As Legal Employers, Chief Legal Officers, Law Schools, State and Local
> Bar Associations, Judges, Court Administrators, Hiring Partners, and Hiring
> Personnel in the Legal Profession, we hereby affirm our commitment to
> diversity in the legal profession, including diversity with respect to
> individuals  with mental, physical, and sensory disabilities.  Our pledge is
> based on the need to enhance opportunity in the legal profession and our
> recognition that the legal and business interests of our clients and the
> populations we serve require legal representation that reflects the diversity
> of our employees, customers and the communities where we operate. In
> furtherance of this commitment, this is intended to be a Pledge for Change
> for the profession generally and in particular for our law departments, firms,
> agencies, law schools, state and local bar associations, courthouses, and
> organizations. We further pledge that we will encourage other law
> departments, firms, agencies, law schools, state and local bar associations,
> court systems, and/or organizations that we do business with to make a
> similar diversity commitment.

41.     The University has a Center for Disability Access and Resources ("**CDAR**"), which

"provides services and support to ensure individuals with disabilities are able to access and

participate in all of the opportunities available." CDAR receives and process applications for

disability accommodations.

42.     CDAR asserts that the primary purpose of documentation is to establish a disability.

However, CDAR's policy is not to require students to submit documentation of their disability

every semester. Rather, CDAR's policy is to ask students for updated diagnosis documentation

only if documentation is older than four years. CDAR states on its website that disability

documentation should be current and relevant, but not necessarily recent: "Some disabilities are

lifelong conditions."

**B.      The Law School Purports to Apply and Enforce its Non-Discrimination and Related
          Policies throughout the "University Community," Including Off Campus**

43.     The University and Law School assert that their policies and conduct requirements

reach beyond the physical location of the campus and apply throughout the "University

Community." This includes the classroom; school-sponsored activities; on campus and off campus; and online.

44.     On its website, the University lists twelve specific apartment complexes and housing providers within the University Community (https://www.uidaho.edu/student-life/off-campus-housing). This includes properties at issue in this lawsuit: Palouse Properties, Inc. (with a hyperlink to the property located at 1636 S. Levick St., Apartment 12, Moscow, Idaho, 83843) and Republic on Main (with a hyper link to the property located at 1006 S. Main, Moscow Idaho, 83843).

**C.     The Law School Does Not Create a Respectful and Non-discriminatory Learning Environment and does not Meaningfully Apply its Non-Discrimination and Related Policies**

45.     Plaintiffs chose to attend the Law School based in material part on the Law School's promises and commitments to a learning environment that is inclusive, respectful, safe, supportive, and responsible; and on its promise to uphold the edict that students must uphold the rights and dignity of others regardless of race, color, national or ethnic origin, disability, or sexual orientation. If Plaintiffs had known that these promises and commitments were not true, they would not have attended the Law School.

46.     In the 2021-2022 and 2022-2023 school years, the Law School failed to create the non-discriminatory learning environment it promised Plaintiffs.

<u>**Hostile Environment Based on Race**</u>

47.     Plaintiff Kelly began as a first-year law student in August 2021. Within the first two months, she experienced repeated racist and homophobic behaviors from Law School staff, professors, and students that isolated her and negatively affected her educational experience.

48.     Shortly after she arrived, Kelly attended a New Student Orientation Program that quickly revealed the hostile environment created and allowed by the Law School.

49.     As part of orientation, Associate Dean of Students, Kristi Running, led a mandatory diversity lecture treating, among other things, the use of offensive language in the school environment. Yet she repeatedly failed to correct or address multiple racist comments made by students in that orientation that create the hostile learning environment the school promises and is required to prevent.

50.     For example, one student, who is white, asserted people of color "are jealous of blue eyes because they can't have blue eyes," and continued to say the term "ocean eyes" could be offensive, because people of color "cannot naturally have blue eyes and are jealous of that." These comments were inaccurate, distracting, offensive, and alienating to Kelly. (People of color can, in fact, have naturally blue eyes, and these comments enforce negative stereotypes as well as the tenet that a race that can "naturally" have blue eyes is inherently superior to one that purportedly cannot.) These comments went unchallenged, and no staff or faculty used them as teachable opportunities to discuss the effect that kind of speech can have on the targeted person in the learning environment.

51.     As another example, another student, who is white, said that it would be unfair for people of color to complain about students saying offensive terms because such terms might be common where the student is from and would not get them in trouble there. Dean Running did not explain how such terms could harm the target of the term or interfere with their learning environment. Kelly raised her hand to engage in the discussion and assert that, even if you do not know your words are offensive, if someone explains why they are and asks you not to say it, you should respect that even if the term is normal to say where they come from. Dean Running ignored Kelly. Instead, she told the students—including the students of color—that they must be more lenient with students who may not know their words are offensive. This alienated Kelly and

demonstrated that the University not only tolerates racially inflammatory language that interferes with other students' learning environment, but also blames the person targeted by the language. It also demonstrated to Kelly that the University does not support free discourse amongst its students—at least, it does not support discourse by students who seek to challenge the racially discriminatory statements of others.

52.     As another example, Dean Running led an electronic exercise in which she instructed students to name "something that bothers you." The University then published students' answers anonymously onto a screen for all to see. One student's comment was: "white people." Kelly did not make the statement. But because she is not white, other students began spreading a rumor that Kelly had made the comment. No one addressed or asked Kelly about the statement and Kelly did not become aware of the rumors until spring of 2022 when another student informed her of the false accusations.

53.     Kelly continued to feel alienated at the orientation by how other students treated her at orientation. They ignored her and would avoid working with her, even when students were told to work together in small groups.

54.     As another example, a professor told a Hispanic student, who had not professed to have any language barriers, that his "English was very good." In another instance a student commented to that same Hispanic student that Immigration Law "fits your demographics." This type of discourse by University staff and students, left unchecked, contributes to and exacerbates divisions based on ethnicity and undermines the University's promise to provide an inclusive and non-discriminatory environment. By doing so, such discourse substantially interferes with students' ability to learn.

55.     When classes began, Kelly continued to experience discriminatory treatment that substantially interfered with her ability to learn. In September 2021, Kelly attended the required first-year torts class taught by Professor David Pimentel. In one instance, Professor Pimentel lead the class in a discussion of a case involving a car theft. The only black male student in the class raised his hand. Professor Pimentel called on him and said: "Oh I bet you know all about car theft huh?" Professor Pimentel made no such comments to other students.

56.     On information and belief, immediately following class, other students (not including Kelly) who felt uncomfortable with Professor Pimentel's comments reported the inappropriate comments to Dean Running and Dean Joanna Kalb. The following day, Professor Pimentel told the class someone had told on him and, in a demeaning tone, that he was "sorry."

57.     Professor Pimentel thereafter began treating Kelly and the other student of color noticeably colder than he did their white classmates. For example, although Kelly would regularly attempt to participate in class discussions, Professor Pimentel would call on her much less frequently than her white classmates: he called on her maybe twice the entire semester. Professor Pimentel was less friendly and more monotone in his communications with Kelly and the other student of color, whereas he would joke around and laugh with white students. This contributed to Kelly's feelings of alienation and discomfort, and further distracted her from her studies.

58.     In another instance, Professor Pimentel told the class he might "accidentally slip and say the n-word during the lecture" from listening to so much rap music at a music convention he had just attended. This comment upset Kelly and distracted her from the actual class content, which was unrelated to rap music, music conventions, or the "n-word."

59.     Kelly quickly reported Professor Pimentel's behavior to Dean Running. Dean Running did not advise Kelly to report the incident to OCRI.

COMPLAINT AND JURY DEMAND – 19

60.     Again, Professor Pimentel the next day told the class that "someone had made a fuss" about his comment and he again apologized.

61.     On information and belief, Dean Running did not report any of Professor Pimentel's conduct to OCRI. The University's lack of action confirmed Kelly's fear that the University tolerated discriminatory language that would negatively interfere with her learning environment; and, in contrast, that the University did not support discourse aimed at responding to discriminatory or harmful language.

62.     As the school term progressed, Kelly continued to experience racially discriminatory treatment and discourse by other students, both in and out of class. Students would slam doors in her face, go out of their way to avoid her in classroom group projects, and outright shun her when she walked into a room. In one instance, Kelly walked into the law school's common room where students belonging to the Christian Legal Society were discussing the Kyle Rittenhouse criminal trial and the "Black Lives Matter" demonstrations made in support of the alleged victims. She heard one student mockingly comment "those people are always protesting." When the students realized Kelly was in the room, they suddenly went quiet and stared at her until she left.

63.     Kelly continued to experience racially hostile discourse from students in and out of class. In October of 2021, during her torts class, a white student interrupted the class topic under discussion (a slip-and-fall case) to randomly reference *Brown v. Board of Education* and assert that black people never wanted to end segregation. On information and belief, the student felt comfortable sharing this view because of Professor Pimentel's prior race-based comments. In this instance, Professor Pimentel cut the student off and told him the topic was not appropriate for the

class discussion. The student's comments alienated Kelly and distracted her (and the other student of color in the class) from the instruction.

64.    On information and belief, Professor Pimentel did not report the student's comments to OCRI.

65.    A few days later, Professor Pimentel led a class discussion on whether pets are considered property or family under the law. The same student stated that pets were property in the same way that slaves had been property. Professor Pimentel again cut the student off. The comments left Kelly feeling alienated, uncomfortable, embarrassed, and upset. She maintained her composure during the rest of class but broke down crying as soon as she returned to her car.

66.    On information and belief, Professor Pimentel did not report the student's comments to OCRI.

67.    As soon as she pulled herself together, Kelly informed Dean Kalb about the student's comments. Kelly explained that she had never in her life faced so much micro-aggression and racism until she moved to Moscow. She explained that, at that point, she and other minority students she knew were considering transferring schools because they did not feel accepted or safe at the University. She stated: "It is hard enough being one of two black people in the class of 2024, but the added ignorance and hatred we get from students and staff makes me feel even more like an outcast and like I should not even be here." Kelly also informed Dean Kalb of her experience at the orientation session.

68.    Dean Kalb responded that she was following up on the incidents and that the school would be taking action.

69.    The University did not provide Kelly with any follow-up to her report and did not advise Kelly to also report the incidents to OCRI. Kelly is unaware of any action the University

took to stop the race-based harassment or to correct Professor Pimentel's conduct, failures to act and report, statements, and retaliation.

70.     Throughout the fall 2021 semester, Kelly was ignored and avoided by law students and professors alike. For example, a student in Kelly's torts class opined during discussion that tort laws should not protect a minority who cannot speak English and is in the United States illegally. When Kelly raised her hand and responded that this characterization would result in treating minorities as less than human, the professor spoke over her and defended the first student's assertion rather than allow the discussion to ensue.

71.     When not ignoring Kelly, students directed rude comments at her. In addition to being distracted by rude comments from students in or before classes, Kelly's mental health began to decline, and she began to feel isolated due to her race and the University's failure to support her.

**Hostile Environment Based on Sexual Orientation**

72.     During the 2020-2021 school year, students at the Law School's Moscow campus submitted a proposal to the University for the establishment of a Christian Legal Society ("**CLS**") chapter. CLS is an Illinois non-profit corporation headquartered in Springfield, Virginia, with student and lawyer chapters throughout the country. CLS espouses "beliefs and practices" opposed to "same-sex marriages and lesbian/gay/bisexual/transgender conduct and relationships." CLS believes, among other things, that religious organizations should be allowed to discriminate based on sexual orientation and gender identity, which CLS calls "SOGI discrimination."

73.     The University's Student Bar Association ("**SBA**") reviewed CLS's application to become an official student organization. The University, through Dean Kalb, overrode the SBA

application review process and approved CLS as a registered student organization. Professor Richard Seamon is CLS's faculty advisor.

74.     In fall of 2021, CLS members began harassing other students with anti-LGBTQIA+ and anti-Black conduct. During the first week of school, a CLS member, "Student X," obtained a rainbow flag, a well-known symbol of the LGBT community. Sporting the flag as a cape, Student X ran through the library basement near the student carrels and jumping around, making "feminine" actions, and holding the flag with his wrists tilted downward (a gesture long used to mock gay males as "limp-wristed"). Student X similarly denigrated a "Black Lives Matter" flag by wearing it as a cape and draping it over his carrel. Student X displayed this treatment of the flags multiple times within the student carrels and the student parking lot of the University.

75.     On September 18, 2021, John hosted a social mixer for law students at his home in the University's approved off-campus housing. John had attended the first year of law school (2020-2021) remotely from Arizona due to COVID. He hosted the mixer to meet law students in person and invited everyone. Three CLS members, including Student X, attended John's social gathering, and John welcomed them.

76.     John had not informed other students of his sexual orientation and was generally not "out" at school.

77.     After several drinks, Student X cornered John in the kitchen and asked him "what does it feel like to be a faggot?" John responded by announcing Student X's question to everyone, at which point Student X charged toward John, putting John in fear for his safety. John reflexively put up his hands and pushed himself away from Student X. The two other CLS members who attended the gathering with Student X physically restrained JD and removed him immediately from John's home. This behavior by Student X "outed" John to the other students at the mixer.

78.    As a result of this incident between John and Student X, John's previously private views and sexual orientation became public knowledge to the people at the mixer and, in the days following, to other students who learned what had happened. This resulted in John's sexual orientation becoming public knowledge to the student body, faculty, and staff at the University.

79.    Student X's verbal and physical acts toward John caused him mental harm and apprehension of additional mental and/or physical harm.

80.    On September 21, 2021, John and another student reported Student X's behavior to the College of Law and OCRI. John was so concerned for his safety that he transferred to a different unit after the assault. On information and belief, several other students who attended the mixer likewise filed complaints with OCRI.

81.    On information and belief, in this same time period, another LGBTQIA+ student submitted a complaint to OCRI that he too had been called a homophobic slur ("faggot") by a classmate at a fraternity house party on campus. Plaintiffs are not aware of the result of that complaint.

82.    OCRI initiated an investigation into the events set forth in John's complaint and issued mutual no-contact orders to both John and Student X. OCRI representatives assured John it would procure additional campus security in the parking lot to ensure his safety. He never observed any such additional security and, on information and belief, the University provided no such additional security.

83.    Throughout the 2021-2022 academic year at the College of Law, CLS members regularly interrupted Plaintiffs' study and safety to verbally harass John and Jane, as well as other law students who identify as LGBTQIA+, based on sexual orientation and gender identity.

Harassment occurred in class, in passing, and at their study carrells. CLS members also harassed John based on his Hindu religion, Pacific Islander race, and national origin.

84.     In October of 2021, Jane, Kelly, John, and other students at the University were under distress because of the ongoing racist and homophobic comments that had been made by students and professors towards people of color and LGBTQIA+ individuals. This distracted all three Plaintiffs from their studies.

85.     During this time, students, professors, and deans met on several occasions at a local cafe to discuss current events in the law community, the growing safety concerns of students of color and LGBTQIA+ students, and how they could support each other. One of these meetings occurred after John was assaulted, and he attended the meeting to address his concern. Jane also attended these meetings and conveyed that she felt unwelcome, intimidated, and concerned for her safety because of the CLS derogatory conduct in class and on campus.

86.     John submitted a request to OCRI for approval to take Constitutional Law II for Fall semester in Boise remotely. The University denied John's request and directed him to contact the CDAR office for accommodation to take the remote course. Around the same time, John had torn his meniscus and required surgery on his knee. CDAR informed John his application would be denied if it was based only on his growing safety concerns and Professor Seamon's comments.

### **Resolution of John's Complaint**

87.     On December 17, 2021, OCRI issued its final investigation report of John's complaint regarding Student X's attack of him in September 2021. The report was "inconclusive."

88.     First, OCRI's report revealed that OCRI did not engage in a fair evaluation of John's complaint. OCRI concluded that Student X used the word "faggot," a derogatory word, because of John's sexual orientation. But, OCRI concluded that there was "insufficient evidence"

that the words was "an act of intimidation or hostility towards Complainant" because it chose to believe Student X's and his friends' statement that Student X asked John whether he could use the word "faggot" around John, which OCRI believed was not an act of intimidation or hostility, rather than John's testimony that Student X asked John "how does it feel to be a faggot."

89.     Second, OCRI did not provide John with a fair process. John disagreed with OCRI's findings and met with the University of Idaho's Dean of Students, Kari Fealy, to discuss his procedural rights. She informed him he could pursue a hearing before the Student Conduct Board, which consists of University employees and students empaneled to hear complaints brought under the Student Code of Conduct. However, Dean Fealy then scheduled the hearing during John's midterm exam week in February 2022. John met again with Dean Fealy to request deferment of the hearing to avoid interrupting his education and testing. She told him he must agree to the proposed hearing date or else drop his appeal. She followed up in writing to formally deny his request because "there needs to be a conclusion of this matter for both parties." She then offered him other hearing dates—still during John's midterm testing week—or the option to pursue "informal resolution." These options did not provide meaningful relief: the first option would compromise John's testing, and the second would not sufficiently address John's concerns. John therefore declined. Dean Fealy finally offered a hearing date of March 4, 2022. Faced with no other options, John agreed.

90.     On or about February 10, 2022, a classmate invited John to a social gathering at her home. This property was one of those listed under the "Palouse Properties" on the University's website. When John arrived at the gathering, he was surprised and concerned to see most students in attendance were CLS members. One of those members was the CLS chapter president, "Student Y," whom Student X had appointed as his student advisor to support him through the OCRI

investigation. Student Y approached John to discuss the details of the ongoing OCRI investigation process. Student Y began pressing John to "just drop" the OCRI complaint against Student X and to "just move on" because "this whole thing could ruin [Student X's] life." John refused. Other CLS student members who were attending the gathering overheard the conversation between Student Y and John. Upon John's refusal, the other CLS members in attendance at the gathering began making degrading and harassing comments to John. John's concern for his safety increased; he was genuinely concerned for his life and abruptly left the gathering.

91.     The next week, John left for Arizona for his scheduled knee surgery. While recovering, John continued attending and participating in his classes because of his knee and recovery with one month left of school until final exams. The law school informed him that pursuing a disability accommodation was the easiest method to obtain accommodation approval and keep him remote for his safety.

92.     On March 4, 2022, the SBC conducted a remote hearing on John's appeal. Following the hearing, the SBC conducted an independent investigation and released its final report on March 11, 2022. The SBC disagreed with OCRI's findings and unanimously concluded that Student X violated the University of Idaho Student Code of Conduct. Specifically, the SBC found that Student X committed a severe verbal act directed at John because of his sexual orientation; that the verbal act created a hostile environment and caused John mental harm and apprehension of additional mental and/or physical harm; and that John's apprehension of physical harm was reasonable under the circumstances. Unlike OCRI, the SBC found that the context of Student X's use of the derogatory slur was not important: Student X's deployment of the term itself was hostile. The SBC implemented disciplinary measures against Student X and ordered Student X not to intimidate or retaliate against John.

93.     The severity of Student X's use of the slur, and his violent conduct toward John, created a hostile environment that the University failed to correct. Throughout his tenure at the College of Law, John has been forced to attend classes alongside Student X despite Student X's assault on him.

94.     In the weeks following the SBC's decision, John heard rumors that some of the CLS students, who self-identified themselves as "fascists," were saying they would "like to round up all the queers and execute them."

95.     Because of the ongoing negative events targeted towards LGBTQIA+ students and the University's lack of action, John and other students had growing safety concerns in an increasingly hostile environment.

### **Moment of Community**

96.     In the spring of 2021, all three Plaintiffs attended the required Constitutional Law I course taught by Professor Richard Seamon. During lectures, Professor Seamon revealed hostility toward gay rights, such as by intentionally misgendering a trans female student and using her "dead name" despite being corrected multiple times and informed his actions were offensive. Professor Seamon's conduct distracted Plaintiffs and disrupted their ability to focus and receive the education other students were receiving.

97.     Professor Seamon's conduct was so open and pervasive that many other law students knew of it even though they did not attend that class. But because Professor Seamon was the only professor teaching the required Constitutional Law I and II courses at the Moscow campus in the spring of 2022, the only other option was to enroll in a Constitutional Law course taught in Boise and attend remotely or move to Boise.

COMPLAINT AND JURY DEMAND – 28

98.     On March 31, 2022, the word "faggot" was found written on a University of Idaho College of Law white board in Boise, Idaho.

99.     March 31 is the International Transgender Day of Visibility. This was also less than three weeks after the SBC issued its decision to discipline Student X for his use of that term and conduct toward John.

100.    On the same day, Dean Kalb sent an email regarding the incident and to announce a moment of community would be held the next day:

> Dear students –
>
> Last Monday, a member of our Boise community arrived to find a derogatory slur directed against the LGBTQIA+ community on a classroom whiteboard.  This is not the only incident of this kind that has occurred on our campuses this year.  It breaks my heart that we struggle to be a place that respects the dignity and humanity of every person in our community.  Law school is tough enough, as you know, without having to face down insults and slurs.
>
> In our national and local discourse, this request for respect may be confused with some kind of limit on discourse.  I want to be very clear that I expect and hope that our classrooms and hallways will be a place of robust discussion and debate.  In every place I've worked, including here, I have had the great fortune to discuss and learn from faculty, staff, and students whose views differ from my own.  I have made mistakes and learned from them, and I've grown and changed as a result, as a person and as a lawyer.  The foundation for all of these discussions is mutual respect and grace.  Bullying is not a conservative or a liberal value, and I will do everything in my power to stop it.
>
> Poignantly, today is the national Transgender Day of Visibility.  Transgender people in this country are subjected to rising levels of violence, with murders last year reaching their highest number since tracking began.  Dehumanizing each other through our language has terrible consequences.  And so I ask you again to help me make this law school the kind of place you want to be, where we can disagree and debate, while also caring for and respecting each other.

COMPLAINT AND JURY DEMAND – 29

Some of your faculty will be hosting a moment of community this Friday (tomorrow) at 9:20 a.m. MT/8:20 PT.  You will receive a separate communication with more details from Associate Deans Bauges and Running.

As always, I welcome hearing from you, and I do read and (try my very best to) respond to your emails.

Yours,

**JOHANNA KALB**
Dean and Professor of Law

101.    Plaintiffs Jane and Kelly planned to attend the Moment of Community together. John was attending classes remotely from Arizona so was unable to attend.

102.    The next morning, at 7:55 a.m., Professor Seamon sent an email stating that he would be participating in the Moment of Community as the faculty advisor to CLS. He warned, however, that students must not be late to class:

**Subject:** Please make every effort to be on time today; no foolin'!: SP22 LAW816-01

Some of you—I hope many of you—will be participating in this morning's community building events in front of the law school. I myself will be participating: As faculty advisor to the Christian Legal Society, I'll be part of a prayer circle, in which all are welcome. Please, however, make sure you get to class on time. Participation in the morning events is no excuse for being late. Let's everyone make his or her best effort! Thank you!

103.    Jane and Kelly did not intend to join the CLS prayer circle, which they believed would be separate and non-mandatory. When Jane and Kelly arrived at the event, approximately thirty people were present including students, professors, Professor Seamon, and Dean Running. The majority of students present were not CLS members.

COMPLAINT AND JURY DEMAND – 30

104.    Professor Seamon and the CLS students hijacked the Moment of Community and created a hostile environment for other students based on their sexual orientation.

105.    Shortly before the Moment of Community was scheduled to commence, at 8:20 a.m., Professor Seamon began to speak and asked everyone to join hands for a prayer. CLS students began grabbing everyone's hands, including Kelly's and Jane's. Kelly was uncomfortable but did not feel she had a choice or chance to step out of the circle before her hand was grabbed and the prayer started. Jane was also uncomfortable and distressed by CLS's usurpation of the Moment of Community. Even though CLS members attempted to grab their hands, Jane and Kelly did not participate consensually in the prayer circle.

106.    After the prayer concluded, Jane asked one of the CLS members why they were attending the Moment of Community in support of the LGBTQIA+ community when CLS publicly condemned and rebuked the LGBTQIA+ community.

107.    The response was overwhelming. CLS students called Jane and other LGBTQIA+ students "fornicators" and told them "Homosexuality is a sin," they are all "going to the guillotines of Hell," they "have no rights," and they "are not welcome at the law school." One CLS member verbally attacked Jane directly saying because she is gay, she "was a sinner and could never get into the kingdom of heaven."

108.    At no point during the Moment of Community event did Professor Seamon or CLS members express or demonstrate any support for or allyship with LGBTQIA+ students.

109.    The University's faculty members, professors, and deans of the law school who attended the Moment of Community and witnessed CLS's behavior and remarks, failed to take any action or make any attempt to stop CLS members from harassing Jane or other LGBTQIA+ students.

COMPLAINT AND JURY DEMAND – 31

110.    Jane responded to the CLS member that she, her fiancé, and other LGBTQIA+ people are not sinners and are not going to hell. She explained she is a practicing Catholic and that the Bible does not say this. Professor Seamon responded: "The bible does say you are going to hell" and that the CLS member's statements were "true." Professor Seamon then stated he needed to get to class, passively reminding LGBTQIA+ students that their tardiness or absence would not be excused.

111.    Professor Seamon's email warning about attending the Moment of Community, and his conduct at the Moment of Community, intimidated Plaintiffs Jane, Kelly, and John as well as other students and disrupted their focus and ability to learn in his classroom.

112.    Plaintiffs and other students attending Professor Seamon's class after the Moment of Community, including John who was attending remotely, found it hard to focus on their studies and were distracted by the earlier events. They felt bullied and forced to attend class under the threat of discipline during a time of stress after having their Moment of Community shattered by the CLS event.

113.    During class, Jane received a telephone call from Dean Kalb. She left Professor Seamon's class in tears to take the call. She explained to Dean Kalb the events that had transpired.

114.    Dean Kalb recommended Jane reach out to OCRI.

115.    Later that same afternoon, Jane, Kelly, and John brought a complaint to the Deans of the Law School and President of the University requesting an immediate OCRI and Title IX investigation.

116.    On April 4, 2022, LGBTQIA+ students were so hurt and angry from the disruption caused by Professor Seamon and the CLS students at the Moment of Community that they participated in a peaceful walkout. Approximately twenty students participated in walking out of

Professor Seamon's Constitutional Law class to attend a Moment of Solidarity and show their support of the LGBTQIA+ community. This was the original purpose of the Moment of Community.

117.    Prior to the walkout, Professor Seamon sent a private email to Jane about the walkout. Jane felt retaliated and intimidated by Professor Seamon's email given their last conversation at the Moment of Community.

118.    Following the walkout, Professor Seamon appeared upset by the walkout and made clear he was unhappy with the students that had participated. Professor Seamon sent emails to Jane and Kelly asking to meet him in private to discuss the events. Both Jane and Kelly were not comfortable meeting alone with Professor Seamon and eventually declined. Jane made it clear in her email she did not want to talk or meet with Professor Seamon. Despite this, Professor Seamon continued to email her.

119.    On April 4, 2022, the ABA student board invited students to come speak with them about their experiences at the law school. During his class, Professor Pimentel encouraged only students "that had nice things to say" or that are "positive" to attend the ABA meeting, or else only students with negative comments will show up. Professor Pimentel made these comments while being aware of the prior events that had taken place on campus and in his class.

120.    During the ABA meeting, several CLS student members asserted that they were being discriminated against because of their first amendment rights and that they were in a "culture war and [they] were going to win." No student stated in that meeting that they were in a religious war.

121.    Jane (in person) and John (remotely) conveyed their experiences and concerns to the ABA student board. Jane explained what CLS members had said to her and that the

constitutional right to freedom of speech does not protect such a violent verbal attack. She also described the recent events and expressed that due to the lack of support from the University, she now feared for her and other LGBTQIA+ classmates' safety on campus.

122.    Unfortunately, Jane, Kelly, and other students' complaints of harassment and discrimination along with their growing safety concerns were not taken seriously due to Professor Pimentel's comments combined with the University's continued inaction.

123.    On April 5, 2022, the CLS student president disrupted Jane's individual studies by leaving a note in her study carrel. Upon discovering the note, Jane immediately felt unsafe and began to have a panic attack. Jane took the note to Dean Running's office to report the incident. She requested to leave campus due to increasing anxiety and safety concerns. Jane felt she was now being targeted by CLS student members and she was unsafe on campus.

124.    Jane filed a complaint with OCRI. The University issued reciprocal no-contact orders for three CLS student members. In retaliation for being served with the no-contact orders, those CLS members and leadership, represented by the Alliance Defending Freedom, filed a federal lawsuit against the University of Idaho on April 26, 2022, claiming the University's actions violated, among other things, their freedom of speech and religion ("**CLS Lawsuit**").

125.    OCRI told Jane they would open and investigate her complaint. Despite Jane requesting OCRI to provide updates on their investigation, OCRI refused. Jane was later told by the Director of OCRI Lindsay Ewan that the University never performed an investigation on Jane's complaint, and in fact that OCRI had received specific instruction, from someone internal at the University, to **not** perform an investigation.

126.    On or about April 5, 2022, someone threw eggs all over a white student's truck. Students began spreading rumors that Kelly was the culprit. She was not. Kelly learned of the

rumors in class while seated two seats away from the truck's owner. Kelly began to have a severe anxiety attack and was forced to leave class.

127.    Kelly reported her concerns to Dean Running. Dean Running instructed Kelly to just "ignore it." This confirmed Kelly's fear that the University tolerated discriminatory behavior and expected students of color to not take offense to such treatment.

128.    Around the same time, Kelly reported to Dean Running and Dean Kalb that she did not feel safe on campus because of the CLS students' conduct and her classmates' treatment of her. OCRI allowed Kelly to finish the semester online.

129.    On April 6, 2022, Jane received a Facebook private message from a law student (who was also a Student Bar Association Student Representative) shaming Jane for openly talking about the discrimination LGBTQIA+ students were facing at the University and for participating in the walkout. The message specifically requested that Jane not speak publicly about her experiences and keep them private. This was another example of the hostile environment and intimidation of LGBTQIA+ people at the University of Idaho.

130.    On information and belief, in the fall of 2022, a CLS member assaulted another student that identified as LBGTQIA+ and called him a "faggot."

**<ins>Jane Flees Idaho</ins>**

131.    Plaintiff Jane felt unwelcome, intimidated, concerned for her safety, and distracted from her studies because of CLS student members' derogatory conduct both on and off campus. Professor Seamon's support of CLS's stance, and the University's failure to address it, made Jane feel helpless and as if the University agreed with CLS's stance on LGBTQIA+ students.

132.   Plaintiff Jane knew that other LGBTQIA+ students had begun making plans to transfer to different law schools because of the ongoing harassment and were thus being driven out of their homes and community.

133.   With the ongoing stress and tension caused by the events on campus, Jane's mental health declined rapidly. Jane had already applied in January 2022 for accommodations for her mental and physical disabilities with CDAR. However, Jane was not approved to attend class remotely until she brought Dean Kalb a copy of the note left by a CLS student in her carrell.

134.   Jane moved to Washington where she finished the Spring 2022 Semester attending classes remotely. The University, however, did not provide an effective means for remote attendance. The remote education technology was not always working. Professors did not properly involve remote attendees, such as by answering their questions or including them in class discussions. Jane's grades began to suffer as a result.

135.   On or about May 17, 2022, during the beginning phase of the CLS Lawsuit, Professor Seamon provided his personal copies of his emails with Jane to the Alliance Defending Freedom ("**ADF**") without Jane's knowledge or consent. The Southern Poverty Law Center has listed ADF as an anti-LGBTQIA+ hate group since 2016 because of ADF's stated support for the idea that being a member of the LGBTQIA+ community should be a crime and that individuals who engage in consensual, same-gendered sex should be put into prison.

136.   When Jane was informed that Professor Seamon had released her personal information to ADF, her mental and emotional health declined even more. She again feared for her safety and her life if she returned to campus.

137.   In July of 2022, Jane was served a subpoena duces tecum from the ADF at her partner's home in Seattle. The process server told her he could find her wherever she was.

138.    The University of Idaho's lack of response to and disregard for the CLS students' and faculty members' actions towards members of the LGBTQIA+ community caused Jane to feel unsafe and unwelcome on campus. Jane felt she had no other option but to transfer schools, despite the steep increase in costs.

139.    Jane applied to Seattle University Law School in July of 2022 and was accepted.

140.    To date, the University of Idaho has not responded to Jane regarding her complaints of harassment even though she repeatedly requested updates and relayed her availability for an investigation. To the best of Jane's knowledge and belief, the University has not taken any precautionary steps or measures to address student safety concerns on campus.

141.    As a result of the University's continual treatment of Jane, Jane did not receive the same educational experience at the College of Law that other law students did.

142.    As a result of the University's continual treatment of Jane, Jane did not receive the educational experience the University promised her, agreed to provide, and for which she agreed to matriculate and pay fees.

**Kelly Flees Idaho**

143.    The combination of the continual harassment by members of the CLS and ongoing false rumors about her caused Kelly to feel fearful, anxious, and unsafe on campus. Kelly finished the Spring 2022 semester through remote attendance.

144.    At the start of the Fall 2022 semester, Kelly became able to review her exam results from Professor Seamon's spring 2022 Constitutional Law course, for which she had received a C+. Kelly received a B- or higher in every other class.

145.    Upon review of the exam, Kelly found that she was 4 points short from a B- and that Professor Seamon had failed to add 7 points to her grade she should have received. Kelly

emailed Professor Seamon requesting to meet and go over the exam due to her suspicion of an error in his grading. Professor Seamon replied that he would be willing to discuss the exam but would not change the grade even if the missing points were found to be correct because of the school's policy that grade changes may be made only for "math" errors. The policy, however, does allow grade changes for "computational" and "process" reasons: and Kelly's request was based on Seamon's incorrect computation of points. Because of her fear of meeting with Professor Seamon, and knowing he would refuse to fix the grade, Kelly did not meet with him. On information and belief, Professor Seamon refused to fix the grade for discriminatory and retaliatory reasons, and not based on the school's policy.

146.    On the first day of fall semester 2022, Kelly learned that a group of CLS students had entered a black professor's classroom and begun loudly whispering "white power" during the lecture. One of the CLS students was a classmate of Kelly and sat next to her in one or more classes. This event, and knowing she sat next to one of the students, caused Kelly distress, distracted her from her studies, and compromised her sense of safety on campus.

147.    Several students, including Kelly, reported this incident to Dean Running. To the best of Kelly's understanding and knowledge, the University took no action and conducted no investigation.

148.    At this point, Kelly's mental health had dramatically declined, and she started experiencing debilitating fear, depression, and daily anxiety attacks. Kelly struggled to eat and keep food down and became physically frail.

149.    Kelly met with Dean Running to discuss moving to remote classes due to her deteriorating mental health. Dean Running said remote learning was not even a possibility unless Kelly was diagnosed with a mental illness and could provide documentation in an application to

CDAR. Until then, Kelly was expected to regularly attend classes in person. Having accrued over thirty credits, Kelly was no longer eligible to transfer schools without losing credits. Kelly was trapped between requesting an accommodation or dropping out of law school. Kelly reached out to CDAR asking what specific information was needed for her to receive an accommodation for her disability. Kelly was not able to obtain a doctor's note or visit for a few weeks because of health insurance issues. Dean Running and CDAR were aware of Kelly's situation and did nothing to assist or guide her through the process.

150.    Kelly could not find a doctor who accepted her insurance in Idaho and was refused by Washington doctors due to her physical location being in Idaho. Due to feeling unsafe, alone, and stuck in Idaho, Kelly began skipping class, not eating, and not caring for herself. Kelly fainted while at a post office in Moscow, from which she was taken to the hospital in an ambulance. The hospital found that Kelly had become severely dehydrated and malnourished due to an inability to eat.

151.    In the beginning of October 2022, Kelly had been starting to try and eat regularly as best as she could and had stopped at a restaurant for takeout. While waiting for her food, Professor Seamon and his family entered the restaurant. While Professor Seamon's family sat, Professor Seamon stood at the table and stared at Kelly. Kelly was extremely uncomfortable, anxiously waiting for her food, while Professor Seamon stood and stared at her. She took her food and left the building as fast as possible. Kelly ran to her car where she proceeded to have a panic attack.

152.    Finally, on October 17th of 2022, Kelly was able to drive to Washington where she met with a therapist. The therapist wrote a letter to CDAR providing her diagnosis of Kelly with depression, anxiety, post-traumatic stress disorder ("**PTSD**"), and adjustment disorder. In the

letter, the therapist states that Kelly's mental health decline directly correlated with the traumatic events and discriminatory experiences she endured while attending the University.

153.    At the end of October 2022, CDAR approved Kelly's request to attend class remotely.

154.    On January 25, 2023, Kelly relocated to her family's home in Washington and continued attending her classes remotely.

155.    Due to sound and video failures on Zoom, and the professors not checking emails or the Zoom chat to become aware of these issues, Kelly often misses class. Professors also do not respond to questions or allow Kelly to participate in group or regular class discussions, which causes Kelly to lose out on classroom experience. Kelly must teach herself much of the class material.

156.    Kelly has emailed professors asking them to be more attentive to the students on Zoom with accommodations. They respond that she should simply watch the lectures posted online afterward. They provided no solution to the class participation challenges she raised.

157.    In April of 2023, Kelly registered for the summer course at the University called Trial Advocacy. This course is only offered once a year to third-year law students and allows them to learn and gain hands-on experience on trial preparation that no other course provides. As part of this process, Kelly was required to coordinate registration with Todd Bowman and receive permission and approval to participate in the course. Kelly requested accommodation for her disabilities that would allow her to attend remotely. She sent several emails to Bowman and ultimately was instructed that the course professor would review Kelly's accommodation request and determine whether Kelly would be allowed to attend the course online.

158.    Kelly did not receive further communication from the University about Trial Advocacy. She was not able to attend the course for credit.

159.    Kelly anticipates graduating in May of 2024 from the College of Law. Because of the University's inaction and failure to address Kelly's ongoing safety concerns, the anxiety and PTSD Kelly suffers as a result of the University's actions, and Kelly's fear of returning to the Moscow campus, Kelly does not plan on attending the graduation ceremony in Moscow.

160.    As a result of the University's continual treatment of Kelly, Kelly has not received the same educational experience that other law students did.

161.    As a result of the University's continual treatment of Kelly, Kelly has not received the educational experience the University promised her, agreed to provide, and for which she agreed to matriculate and pay fees.

### John Flees Idaho

162.    Plaintiff John left school around early March of 2022 because he was threatened and intimidated by CLS members and felt unsafe attending in person. Professor Seamon's and the CLS members' disruptions to Plaintiff John's studies and life have been detrimental to Plaintiff John's health, education, and life.

163.    John tried to transfer to a law school in Arizona for his safety. However, the ABA does not allow a student to transfer more than thirty law school credits to a new school. A student who transfers after accruing thirty credits risks loss of any credits beyond thirty. The University of Idaho would not approve any programs John requested that would allow all of his credits to transfer. John was therefore forced to remain at the Law School and continue to be subject to its ongoing discriminatory and retaliatory practices.

164.    The University never provided John the opportunity to attend classes remotely based on his concerns for his safety even though the school had the authority to do so. John was required to attend classes in person and remotely with his assaulter Student X.

165.    The University eventually approved John's request to transfer to the Law School's Boise campus in May of 2022. However, the University denied John's request for a cost-of-living-adjustment that would compensate for the increase in costs of living in Boise compared to Moscow. Without the additional compensation, John could not afford the increase in cost. Because the University had already denied his request for remote attendance at the Boise campus based on sex discrimination, John was forced to remain in Moscow.

166.    Upon instruction and support from Dean Running, John contacted CDAR to apply for remote attendance accommodation because of his mental disabilities (Dyslexia and PTSD) and his physical disability (bone degenerative disease).

167.    Before the fall semester of 2022, CDAR requested substantial and invasive documentation from John's doctor explaining the diagnosis of his disability, duration, details of the disability, and explanations on why remote attendance would be necessary. But CDAR already had documentation from John regarding his disability and did not need additional documentation. Indeed, CDAR's policy is that it does not require supplemental or ongoing documentation so long as the documentation is within the last four to seven years. On information and belief, CDAR demanded additional documentation as a means of discrimination and retaliating against John for his complaints (including his complaints of discrimination) and disability.

168.    John nonetheless complied with CDAR's requests and provided additional documentation.

169.    While waiting for CDAR to process his application for remote attendance, the University still required John to attend in person classes in the same classroom as Student X and other CLS members who had previously harassed John and other students of the LGBTQIA+ community.

170.    Throughout his law school tenure, the University provided no option for John to receive his education other than to attend classes, in person and remotely, with the same students he had reported multiple times for personally harassing him.

171.    In September 2022, John was unable to attend the College of Law's required Professional Development Program because the University did not provide remote attendance as an option. As a result, John did not receive the same educational experience as students who do not require remote attendance as an accommodation.

172.    CDAR ultimately approved John for a disability accommodation to attend classes remotely. John has attended classes remotely at the College of Law's virtual learning community since November 2022.

173.    The University's remote education technology, however, does not always work properly. In addition, Professors are not sufficiently trained to involve remote attendees, such as by answering their questions or including them in class discussions. John's grades began to suffer as a result.

174.    For final testing in December 2022 and for midterm testing in Spring 2023, Dean Running approved John's remote exam accommodations which consisted of John being sent physical paper tests. In December of 2022, Dean Running approved John's application for a semester in practice for the Fall 2023 Semester.

175.    Prior to the start of the Spring 2023 semester, CDAR required John to reapply for his disability-related remote attendance. This time, John sent a letter to CDAR through his legal counsel reminding CDAR that it had sufficient documentation of his ongoing disability and asking CDAR to explain the basis for its reapplication request. After receiving that correspondence, CDAR abandoned its "requirement" that John submit a new application for disability accommodation.

176.    In January 2023, Dean Running was replaced as Dean of Students at the Moscow campus by Erin Tomlin, who had previously served as legal counsel for the school and had been involved in John's OCRI investigation proceedings in 2021 and 2022.

177.    In April of 2023, Dean Tomlin contacted John stating John's remote exam accommodations did not include providing physical copies of the test and instead, all testing must be done electronically, or John must return to the Moscow campus to take the exam in person. This decision was made by Dean Tomlin despite her predecessor's decision approving John for home remote testing. Because of Dean Tomlin's sudden decision, John became concerned Dean Tomlin would reverse approval of his already approved semester in practice. To John's knowledge, other law students in his program who had similar approved remote accommodations were not subjected to the same requirements set forth by Dean Tomlin.

178.    The University did not notify John of these changes in his accommodations, thus failing to provide him with reasonable or sufficient time to adjust for and/or prepare for revisions in testing accommodations. These are unreasonable expectations that, on information and belief, were not placed on students without disabilities.

179.    John contacted CDAR with his concerns and provided additional paperwork from his doctor stating his medical diagnosis and disability and emails containing his previously

approved accommodations. CDAR responded to John's email one week before the scheduled final exams stating they would not mail him a copy of the test itself, even though it had done so in the past to accommodate his Dyslexia (John must read exams on paper rather than a screen). The University informed him it would only send him a "scantron" sheet, and that John would need to download and print a copy of the test himself.

180.    Because final exams were only a week away, John had no choice but to comply with CDAR's and Dean Tomlin's new testing requirements. To do so, John was required to purchase a printer compatible with the University's exam software and his computer to print the exams. The printer costs over $2,000.

181.    On information and belief, the University enforced heightened and inappropriate requirements for John's disability accommodation, and refused to provide reasonable accommodation, in retaliation for his Title IX and other complaints, his disabilities, and his efforts to secure accommodations for his disabilities.

182.    As a result of the University's continual treatment of John, John has not received the same educational experience that other law students did.

183.    As a result of the University's continual treatment of John, John has not received the educational experience the University promised him, agreed to provide, and for which he agreed to matriculate and pay fees.

## V.    CAUSES OF ACTION

### COUNT ONE
**Discrimination on the Basis of Race in Violation of**
**the Fair Housing Act, 42 U.S.C. §§ 3601 et seq., and its Implementing Regulations**
**(On Behalf of John and Kelly and Does I-X)**

184.    Plaintiffs reallege and herein incorporate the allegations set forth in all prior paragraphs.

185.    The Defendant and its agents have discriminated and otherwise made unavailable or denied, a residence in the community on the basis of "race." 42 U.S.C. §3604(a).

186.    Defendant and its agents have discriminated in the terms, conditions, and privileges of the residence of Plaintiffs, and the services and facilities in connection therewith, on the basis of "race." 42 U.S.C. §3604(b).

187.    Defendant and its agents made, printed, or published a notice or statement with respect to residing in the community that indicates a preference, limitation or discrimination based on "race." 42 U.S.C. §3604(c).

188.    Defendant and its agents steered the Plaintiffs away from the Plaintiffs' desired community based on "race." 42 U.S.C. §3604(d).

189.    Such conduct is willful and intentional and exhibits reckless or callous indifference for the rights of the victims.

190.    But for the actions and omissions of the Defendant, Plaintiffs have incurred injuries.

191.    Defendant's actions directly and substantially injured Plaintiffs by causing them to suffer a loss of civil rights and other damages, including lost housing opportunity, humiliation, and embarrassment. Accordingly, Plaintiffs are entitled to compensatory damages under the Fair Housing Act, 42 U.S.C. § 3613(c)(1), and under 42 U.S.C. § 1983.

192.    In doing the acts of which Plaintiffs complain, Defendant acted with reckless disregard of Plaintiffs' federally protected fair housing rights. Accordingly, Plaintiffs seek to recover punitive damages pursuant to the Fair Housing Act, 42 U.S.C. § 3613(c)(1).

**COUNT TWO**
**Discrimination on the Basis of National Origin in Violation of**
**the Fair Housing Act, 42 U.S.C. §§ 3601 et seq., and its Implementing Regulations**
**(On Behalf of John and Does I-X)**

193.    Plaintiffs reallege and herein incorporate the allegations set forth in all prior paragraphs.

194.    Defendant and its agents have discriminated and otherwise made unavailable or denied, a residence in the community on the basis of "national origin." 42 U.S.C. §3604(a).

195.    Defendant and its agents have discriminated in the terms, conditions, and privileges of the residence of John, and the services and facilities in connection therewith, on the basis of "national origin." 42 U.S.C. §3604(b).

196.    Defendant and its agents made, printed, or published a notice or statement with respect to residing in the community that indicates a preference, limitation or discrimination based on "national origin." 42 U.S.C. §3604(c).

197.    Defendant and its agents steered the Plaintiff away from the Plaintiff's desired community because of "national origin." 42 U.S.C. §3604(d).

198.    Such conduct is willful and intentional and exhibits reckless or callous indifference for the rights of the victims.

199.    But for the actions and omissions of the Defendant, Plaintiffs have incurred injuries.

200.    Defendant's actions directly and substantially injured Plaintiffs by causing them to suffer a loss of civil rights and other damages, including lost housing opportunity, humiliation, and embarrassment. Accordingly, Plaintiffs are entitled to compensatory damages under the Fair Housing Act, 42 U.S.C. § 3613(c)(1), and under 42 U.S.C. § 1983.

201.    In doing the acts of which Plaintiffs complain, Defendant acted with reckless disregard of Plaintiffs' federally protected fair housing rights. Accordingly, Plaintiffs seek to recover punitive damages pursuant to the Fair Housing Act, 42 U.S.C. § 3613(c)(1).

## COUNT THREE
### Discrimination on the Basis of Sex in Violation of
### the Fair Housing Act, 42 U.S.C. §§ 3601 et seq., and its Implementing Regulations
### (On Behalf of All Plaintiffs)

202.    Plaintiffs reallege and herein incorporate the allegations set forth in all prior paragraphs.

203.    Defendant and its agents have discriminated and otherwise made unavailable or denied, a residence in the community on the basis of "sex." 42 U.S.C. §3604(a).

204.    Defendant and its agents have discriminated in the terms, conditions, and privileges of the residence of Plaintiffs, and the services and facilities in connection therewith, on the basis of "sex." 42 U.S.C. §3604(b).

205.    Defendant and its agents made, printed, or published a notice or statement with respect to residing in the community that indicates a preference, limitation or discrimination based on "sex." 42 U.S.C. §3604(c).

206.    Defendant and its agents steered the Plaintiffs away from the Plaintiffs' desired community because of "sex." 42 U.S.C. §3604(d).

207.    Such conduct is willful and intentional and exhibits reckless or callous indifference for the rights of the victims.

208.    But for the actions and omissions of Defendant, the Plaintiff has incurred injuries.

209.    Defendant's actions directly and substantially injured Plaintiffs by causing them to suffer a loss of civil rights and other damages, including lost housing opportunity, humiliation, and

embarrassment. Accordingly, Plaintiffs are entitled to compensatory damages under the Fair Housing Act, 42 U.S.C. § 3613(c)(1), and under 42 U.S.C. § 1983.

210.    In doing the acts of which Plaintiffs complain, Defendant acted with reckless disregard of Plaintiffs' federally protected fair housing rights. Accordingly, Plaintiffs seek to recover punitive damages pursuant to the Fair Housing Act, 42 U.S.C. § 3613(c)(1).

## <u>COUNT FOUR</u>
**Interference, Coercion, or Intimidation in Violation of the Fair Housing Act, 42 U.S.C. §§ 3601 et seq., and its Implementing Regulations (On Behalf of All Plaintiffs)**

211.    Plaintiffs reallege and herein incorporate the allegations set forth in all prior paragraphs.

212.    Defendant has engaged in interference in the exercise or enjoyment of rights granted the victims by 42 U.S.C. §§3603 and 3604. 42 U.S.C. §3617.

213.    Such conduct is willful and intentional and exhibits reckless or callous indifference for the rights of the victims.

214.    But for the actions and omissions of the Defendant, Plaintiffs have incurred injuries.

215.    Defendant's actions directly and substantially injured Plaintiffs by causing them to suffer a loss of civil rights and other damages, including lost housing opportunity, humiliation, and embarrassment. Accordingly, Plaintiffs are entitled to compensatory damages under the Fair Housing Act, 42 U.S.C. § 3613(c)(1), and under 42 U.S.C. § 1983.

216.    In doing the acts of which Plaintiffs complain, Defendant acted with reckless disregard of Plaintiffs' federally protected fair housing rights. Accordingly, Plaintiffs seek to recover punitive damages pursuant to the Fair Housing Act, 42 U.S.C. § 3613(c)(1).

## <u>COUNT FIVE</u>
### Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681
### Sexual Orientation Discrimination
### (On Behalf of All Plaintiffs)

217.    Plaintiffs reallege and herein incorporate the allegations set forth in all prior paragraphs.

218.    Plaintiffs are or were enrolled at the Law School as law students.

219.    At all times relevant to this action, the University has received, and continues to receive, federal financial assistance.

220.    Title IX is a federal statute designed to protect employees and students of an education institution, including the University of Idaho, from sexual discrimination and/or sexual harassment based on an individual's sexual orientation and gender identity. Title IX prohibits discrimination on the basis of sex in an institution's "education program or activity," which includes all of the University's operations.

221.    The University's actions and omissions constitute unlawful discrimination against Plaintiffs in violation of their rights under Title IX.

222.    The University actively created and was deliberately indifferent to a culture of hostility to students of the LGBTQIA+ community by permitting practices and failing to follow several policies that include but are not limited to the following:

      a.    Failing to properly address reports and incidents of sexual harassment/inappropriate conduct by its students, student organization groups, and staff towards LGBTQIA+ students.

      b.    Permitting and allowing observable and obvious discriminatory conduct between students, student organization groups, and staff towards LGBTQIA+ students on Campus.

c.    Supporting and funding student organizations that publicly encourage members to harass, confront, and discriminate LGBTQIA+ students based on their sexual orientation and or gender identity.

d.    Ignoring information and reports indicating sexual harassment and discrimination by its staff and students towards LGBTQIA+ students.

223.    The University's differential treatment of Plaintiffs is a direct and proximate result of sexual orientation discrimination.

224.    The University has failed to prevent, respond to, adequately investigate, and/or appropriately resolve instances of sexual orientation discrimination.

225.    Because of the University's continuous unlawful conduct, Plaintiffs have suffered and will continue to suffer harm, including, but not limited to, loss of future educational and employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic damages and non-economic damages.

226.    Plaintiffs are entitled to all legal and equitable remedies available for violations of Title IX, including compensatory damages, injunctive relief, attorneys' fees and costs, and other appropriate relief.

<u>**COUNT SIX**</u>
**Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681**
**Deliberate Indifference to Race, National Origin, Sexual Orientation, and Disability**
**Discrimination and Hostile Educational Environment**
**(On Behalf of All Plaintiffs)**

227.    Plaintiffs reallege and herein incorporate the allegations set forth in all prior paragraphs.

228.    Plaintiffs are or were enrolled at the Law School as law students.

229.    At all times relevant to this action, the University has received, and continues to receive, federal financial assistance.

230.    The University has discriminated against Plaintiffs by subjecting them, through deliberate indifference, to discrimination based on their gender, including disparate treatment, retaliation, and a hostile environment that was sufficiently severe, pervasive, and objectively offensive to interfere with their educational opportunities and deprive them of the benefits of their educational programs.

231.    The University has been on actual notice of the hostile academic environment that Plaintiffs themselves have endured. The University has shown continued deliberate indifference to the discrimination and retaliation by tolerating, condoning, ratifying, and failing to take remedial action to correct it.

232.    The University has also maintained an official policy, custom, and/or practice of deliberate indifference to a known overall risk of discrimination and retaliation. Specifically, the University has (among other things) failed to adequately train its employees to prevent, report, and correct discrimination and retaliation and to address its effects; failed to adequately act on multiple reports of discrimination and retaliation; and otherwise failed to implement adequate procedures to detect, monitor, and correct discrimination and retaliation. The University's official policy of deliberate indifference to gender discrimination has systemically deprived students who are, or are perceived to be, LGBTQIA+ of benefits, privileges, and placement services relative to students who are not.

233.    The University's deliberate indifference to the known risk of discrimination and retaliation, its inadequate response to Plaintiffs' complaints, and its failure to correct pervasive issues of discrimination in the law school have themselves exacerbated the hostile environment that Plaintiffs experienced.

234.     Through its deliberate indifference, the University has denied all three Plaintiffs their rights to learn in an environment free of discrimination and associated retaliation. Plaintiffs have suffered and will continue to suffer harm, including loss of future educational and employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic and non-economic damages.

235.     Plaintiffs are entitled to all legal and equitable remedies available for violations of Title IX, including compensatory damages, injunctive relief, attorneys' fees and costs, and other appropriate relief.

## COUNT SEVEN
**Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681**
**Retaliation**
**(On Behalf of All Plaintiffs)**

236.     Plaintiffs reallege and herein incorporate the allegations set forth in all prior paragraphs.

237.     Plaintiffs are or were enrolled at the Law School as law students.

238.     At all times relevant to this action, the University has received, and continues to receive, federal financial assistance.

239.     Defendant retaliated against Plaintiffs for bringing complaints of discrimination protected by Title IX.

240.     In addition to discriminating against Plaintiffs through deliberate indifference to the risk and reality of a sex-based hostile environment, the University discriminated against Plaintiffs through its deliberate indifference to the retaliatory acts of its employees.

241.     Defendant's actions would dissuade a reasonable student from making or supporting a charge of discrimination.

242.    Plaintiffs are entitled to all legal and equitable remedies available under Title IX, including compensatory damages, injunctive relief, attorneys' fees and costs, and other appropriate relief.

**COUNT EIGHT**
**Violation of Title VI of the Civil Rights Act of 1964**
**Discrimination**
**(On Behalf of Plaintiff Kelly Doe and Does I-X)**

243.    Plaintiffs reallege and herein incorporate the allegations set forth in all prior paragraphs.

244.    Plaintiff Kelly is enrolled at the Law School as a law student.

245.    Plaintiffs Does I-X are currently enrolled, or were at all relevant times enrolled, at the Law School as law students.

246.    At all times relevant to this action, the University has received, and continues to receive, federal financial assistance.

247.    The Defendant's conduct as alleged at length herein constitutes discrimination based on race in violation of Title VII. The stated reasons for the Defendant's conduct were not the true reasons, but instead were a pretext to hide the Defendant's discriminatory animus.

248.    The University Title VII by subjecting Plaintiffs to a hostile learning environment because of race.

249.    As a direct and proximate cause of the University's actions and/or failure to act, Plaintiffs have suffered and will continue to suffer emotional distress consisting of outrage, shock, and humiliation due to the hostile learning environment they experienced.

250.    As a direct and proximate cause of the University's actions and/or failure to act, Plaintiffs have suffered and will continue to suffer loss of educational opportunities and associated opportunities, including employment after obtaining a degree. Plaintiffs are therefore entitled to

COMPLAINT AND JURY DEMAND – 54

general and compensatory damages, such amount to be determined at trial, as well as any other equitable remedies available.

251.    The University's conduct was malicious and/or done with reckless disregard for Plaintiffs' federally protected rights, for which they are entitled to punitive damages.

<u>**COUNT NINE**</u>
**Violation of the Rehabilitation Act and the ADA**
**(On Behalf of Plaintiffs Kelly Doe and John Doe and Does I-X)**

252.    Plaintiffs reallege and herein incorporate the allegations set forth in all prior paragraphs.

253.    Plaintiffs are enrolled at the Law School as law students.

254.    Kelly, John, and Does I-X have, and at all times pertinent hereto had, disabilities within the meaning of the Rehabilitation Act and the Americans with Disabilities Act.

255.    The University failed to provide reasonable accommodations to Plaintiffs, including by creating unnecessary procedural barriers to seek accommodations, even though it could have done so.

256.    The University's failure to provide reasonable accommodations created a hostile learning environment based on disability.

257.    The University violated Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and Title II of the ADA by failing to provide reasonable accommodations and by subjecting Plaintiffs to a hostile learning environment because of their disabilities.

258.    As a direct and proximate cause of the University's actions and/or failure to act, Plaintiffs have suffered and will continue to suffer emotional distress consisting of outrage, shock, and humiliation due to the hostile learning environment they experienced.

259.    As a direct and proximate cause of the University's actions and/or failure to act, Plaintiffs suffered and will continue to suffer loss of educational opportunities and associated

opportunities, including employment after obtaining a degree. Plaintiffs are thereby entitled to general and compensatory damages, such amount to be determined at trial, as well as any other equitable remedies available.

260.    The University's conduct was malicious and/or done with reckless disregard for Plaintiffs' federally protected rights, for which they are entitled to punitive damages.

## COUNT TEN
### Violation of Rights Secured by the Equal Protection Clause of the Fourteenth Amendment, 42 U.S.C. § 1983 (On Behalf of All Plaintiffs)

261.    Plaintiffs reallege and herein incorporate the allegations set forth in all prior paragraphs.

262.    Plaintiffs are members of one or more suspect classes and were unlawfully discriminated against because of their sexual orientation, race, national origin, or disability.

263.    Plaintiffs were similarly situated in all other relevant aspects to other students at the College of Law.

264.    Nevertheless, Defendant created and allowed a hostile learning environment based on Plaintiffs' sexual orientation, race, national origin, and/or disability.

265.    Defendant's actions were done while acting under color of state law and had the effect of depriving Plaintiffs of rights secured by the Constitution and laws of the United States, specifically the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

266.    Defendant's acts were intentional, malicious, willful, wanton, obdurate, and in gross and reckless disregard of Plaintiffs' constitutional rights.

## COUNT ELEVEN
**Breach of Contract
and the Covenant of Good Faith and Fair Dealing
(On Behalf of All Plaintiffs)**

267.    Plaintiffs reallege and herein incorporate the allegations set forth in all prior paragraphs.

268.    The University actively markets its educational programs to minorities.

269.    The University represents and promises potential minority students that the University provides a safe and inclusive environment for them.

270.    The University represents and promises potential minority students that the University has broad and effective policies against discrimination and retaliation, and that it takes active measures to prevent and punish such conduct.

271.    These promises are part of the contract that the University makes with its students in exchange for their matriculation, tuition payments, and fees.

272.    As to students of color and LGBTQIA+ students, these promises are part of the contract that the University makes in exchange for such students to attend the University to meet the University's stated goals, and related funding requirements, of fostering a diverse and inclusive environment.

273.    This contract continues the implied covenant of good faith and fair dealing, which prohibits actions that will violate, nullify, or significantly impair the benefits of the contract to the other party.

274.    Plaintiffs performed under this contract by matriculating and paying fees, costs, and expenses.

275.    The University did not perform its obligations under the contract by failing to provide a safe and inclusive environment for them.

276.    The University did not perform its obligations under the contract by failing to have, and/or by failing to comply with, effective policies against discrimination and retaliation.

277.    The University did not perform its obligations under the contract by failing to take measures to prevent and punish discriminatory and retaliatory conduct.

278.    By breaching its contractual obligations, including the covenant, the University failed to meet Plaintiffs' reasonable expectations of the equal educational benefits to which they are entitled.

279.    By breaching its contractual obligations, including the covenant, the University has caused Plaintiffs substantial damages, including the fees and costs paid to attend the Law School, the fees and costs incurred in transferring to another law school, the fees and costs incurred in attending remotely, as well as lost future earnings and other injuries for which Plaintiffs are entitled to monetary damages and appropriate equitable relief.

## COUNT TWELVE
### Unjust Enrichment
### (Alternative to Count Eleven)
### (On Behalf of All Plaintiffs)

280.    Plaintiffs reallege and herein incorporate the allegations set forth in all prior paragraphs.

281.    Plaintiffs provided a substantial benefit to the University by attending the University and paying tuition fees, costs, and expenses.

282.    Defendant understood and accepted that benefit.

283.    Under the circumstances, it would be unjust for Defendant to retain the benefit without compensating Plaintiffs for its value.

### COUNT THIRTEEN
**Declaratory Relief**

284.    Plaintiffs reallege and herein incorporate the allegations set forth in all prior paragraphs.

285.    There now exists an actual controversy between the parties regarding Defendant's duties under federal and state laws. Accordingly, Plaintiffs are entitled to declaratory relief under 42 U.S.C. § 3613(c)(1), 28 U.S.C. §§ 2201-2202, and Rule 57 of the Federal Rules of Civil Procedure.

286.    Unless enjoined, Defendant will continue to engage in the unlawful acts and the pattern and practice of discrimination and unlawful conduct described in the complaint. Plaintiffs have no other adequate remedy at law. They are now suffering and will continue to suffer irreparable injury because of Defendant's acts of discrimination and unlawful conduct unless relief is provided by this Court. Accordingly, Plaintiffs are entitled to injunctive relief under the Fair Housing Act, 42 U.S.C. § 3613(c)(1), Title VI, Title IX, the ADA, the Rehabilitation Act, and Rule 65 of the Federal Rules of Civil Procedure.

### CLAIM FOR PUNITIVE DAMAGES

287.    Plaintiffs reallege and herein incorporate the allegations set forth in all prior paragraphs.

288.    Defendant's actions directly and substantially injured Plaintiffs by causing them to suffer a loss of civil rights and other damages, including lost housing opportunity, humiliation, and embarrassment. Accordingly, Plaintiffs are entitled to compensatory damages under the Fair Housing Act, 42 U.S.C. § 3613(c)(1), and under 42 U.S.C. § 1983.

289.    In doing the acts of which Plaintiffs complain, Defendant acted with reckless disregard of plaintiffs' federally protected fair housing rights. Accordingly, Plaintiffs seek to recover punitive damages pursuant to the Fair Housing Act, 42 U.S.C. § 3613(c)(1).

## ATTORNEYS' FEES

Plaintiffs seek attorney's fees and costs incurred in pursuing this action pursuant to 42 U.S.C. § 3613, 42 U.S.C. § 1988, Title VI, Title IX, the ADA, the Rehabilitation Act, Idaho Code § 12-120(3), Idaho Code § 12-121, Rule 54 of the Federal Rules of Civil Procedure, and all other applicable law.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38(b).

## PRAYER FOR RELIEF

*Wherefore,* Plaintiffs respectfully request that judgment be entered against Defendant as follows:

1.  A declaratory judgment that the University's actions and inactions:

    a.  Violate the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*;

    b.  Violate Title IX of the Education of Amendments of 1972, 20 U.S.C. § 1681(a);

    c.  Violate Title VI of the Civil Rights Act of 1964;

    d.  Violate Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.*;

    e.  Violate Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794;

    f.  Violate the 14th Amendment of the U.S. Constitution;

    g.  Constitute a breach of contract including the covenant of good faith and fair dealing;

     h.  And, alternatively to a breach of contract, create circumstances in which it would be unjust for the University to retain the benefit conferred by Plaintiffs through their matriculation, attendance, and payment of fees, costs, and expenses.

2.  A permanent injunction:

     a.  Requiring Defendant to make all necessary modifications to its policies, practices, and procedures to comply with the Fair Housing Act;

     b.  Requiring Defendant and its officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, to undergo training on the requirements of the Fair Housing Act;

     c.  Against Defendant from engaging in all unlawful practices alleged in this complaint;

     d.  Requiring Defendant to take affirmative action to provide equal housing opportunities to all persons regardless of their LGBTQIA+ status;

     e.  Ordering Defendant to grant Plaintiff John's request to transfer to the College of Law's Boise campus with a tuition credit to offset living expenses, or to grant Plaintiff John permanent remote learning permission for the duration of his education at the University of Idaho;

     f.  Ordering Defendant to provide reasonable accommodations through remote attendance and testing procedures that provide a substantially equal educational experience to that of students who do not require such accommodations;

     g.  Ordering Defendant to conduct training of its staff regarding compliance with Title VI and Title IX; and

     h.  Ordering Defendant to implement and execute policies and procedures to prevent and respond to hostile discriminatory environments created by staff and/or students;

3.  An award of actual damages to Plaintiffs in amounts to be proven at trial;

4.  An award of punitive damages to Plaintiffs in amounts to be proven at trial;

5.  An award of reasonable attorneys' fees and costs to Plaintiffs pursuant to 42 U.S.C. § 3613, 42 U.S.C. § 1988, I.C. § 12-120(3), Title VI, Title IX, the ADA, the Rehabilitation Act, Idaho Code § 12-120(3), Idaho Code § 12-121, Rule 54 of the Federal Rules of Civil Procedure, and all other applicable law; and

      6.   An award of such other relief as the Court deems just and proper.

DATED September 15, 2023

/s/ Monica Fabbi
Monica Fabbi, ISB No. 10018
mfabbi@ifhcidaho.org
**INTERMOUNTAIN FAIR HOUSING
COUNCIL**
4696 W Overland Rd, Ste 140
Boise, ID 83706
Tel: (208) 383-0695
Fax: (208) 383-0715

/s/ Alyson Foster
Alyson A. Foster, ISB No. 9719
alyson@bdfcounsel.com
Taylor J. Long, ISB No. 11966
tlong@bdfcounsel.com
**BJORKMAN DEMPSEY FOSTER PLLC**
714 W. State Street
Boise, ID 83702
Tel: (208) 401-9533
Fax: (855) 940-1879

*Attorneys for Plaintiffs*