Monica Fabbi, ISB No. 10018
mfabbi@ifhcidaho.org
INTERMOUNTAIN FAIR HOUSING COUNCIL
4696 W Overland Rd, Ste 140
Boise, ID 83706
Tel: (208) 383-0695
Fax: (208) 383-0715

Alyson A. Foster, ISB No. 9719
afoster@bdfcounsel.com
Taylor J. Long, ISB No. 11966
tlong@bdfcounsel.com
BJORKMAN DEMPSEY FOSTER PLLC
714 West State Street
Boise, ID 83702
Tel: (208) 401-9533
Fax: (855) 940-1879

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JANE DOE, an individual; KELLY DOE, an individual; JOHN DOE, an individual; and DOES I-X,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNIVERSITY OF IDAHO, a public University governed by the BOARD OF REGENTS OF THE UNIVERSITY OF IDAHO aka the STATE BOARD OF EDUCIATION, an executive department of the STATE OF IDAHO, et al.,<br><br>Defendants. | Case No. 1:23-cv-00409-AKB<br><br>**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT (DKT. 24) [Dkts. 23 & 26]** |

Plaintiffs Jane Doe ("Jane"), Kelly Doe ("Kelly"), and John Doe ("John") (collectively "Plaintiffs"), by and through their undersigned counsel of record, respectfully oppose Defendant The University of Idaho's ("University's") Motion to Dismiss First Complaint (Dkt. 26, incorporating in large part its original Motion to Dismiss Complaint at Dkt. 23).

## BACKGROUND

The First Amended Complaint and Demand for Jury Trial, Dkt. 24 ("First Amended Complaint") alleges that Plaintiffs, while students at the University of Idaho Law School, endured discrimination because of their race, national original, and/or sexual orientation. The factual allegations are lengthy and replete. Plaintiffs reference them as appropriate below.

## LEGAL STANDARDS

A challenge to subject matter jurisdiction under Rule 12(b)(1) may refer to the face of the pleadings or present extrinsic evidence. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). When the jurisdictional attack is facial, as here, the challenger asserts that the allegations contained in a complaint are insufficient on their face to establish federal jurisdiction. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004); *Balderas v. United Parcel Serv., Inc*., 385 F. Supp. 3d 1090, 1094–95 (D. Idaho 2019). When considering this type of jurisdictional attack, a court must consider the allegations of the complaint to be true and construe them in the light most favorable to the plaintiff. *Love v. United States*, 915 F.2d 1242, 1245 (9th Cir. 1988).

When deciding a motion to dismiss under Rule 12(b)(6), the Court asks whether the Complaint satisfies the Rule 8(a) pleading standard—that is, whether the defendant has been given "fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). The complaint need not include detailed factual allegations but must provide more than "labels and conclusions" or a mere "formulaic recitation of the elements of a cause of action." *Id.* In appraising the sufficiency of the complaint, "the accepted

rule [is] that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [plaintiff's] claim which would entitle [plaintiff] to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957); *see also Hecox v. Little*, 479 F. Supp.3d 930, 958 (D. Idaho 2020) (same). "The court must give the plaintiff the benefit of every reasonable inference to be drawn from the 'well-pleaded' allegations of the complaint." *Thomas v. Wood River Drilling and Pump, Inc.*, 2023 WL 1068584, at *2 (D. Idaho 2023). Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory. *Balistreri v. Pacifica Police Dep't.*, 901 F.2d 696, 699 (9th Cir. 1990). Leave to amend should be freely given even if no request for amendment is made unless the court determines the pleading could not possibly be cured by the allegations of other facts. Thomas, 2023 WL 10686584, at *2; *see also Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1041 (9th Cir. 2011).

## ARGUMENT

### I.      The Eleventh Amendment/Sovereign Immunity Does Not Bar the Claims

The University asserts that, based on its asserted sovereign immunity under the Eleventh Amendment of the U.S. Constitution, the Court lacks subject matter jurisdiction over the claims brought under Fair Housing Act (Counts One through Four), Title II of the Americans with Disabilities Act (ADA) (Count Ten), Title 42, Section 1983 (Count Eleven), and the declaratory and injunctive relief related to these claims (Count Thirteen). Contrary to the University's assertions, sovereign immunity does not bar these claims.

#### A.      Fair Housing Act (FHA) Claims

Under the Eleventh Amendment, States are immune from suit by private parties in the federal courts. U.S. Const. Amend. XI. This immunity extends to defendants which are state agencies. *Hirsh v. Justices of Supreme Ct. of State of Cal.*, 67 F.3d 708, 715 (9th Cir. 1995) (per

curiam). This bar can be overcome either by waiver by the State, or if Congress authorizes such a suit in the exercise of valid authority. *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670  (1999). To determine whether Congressional abrogation applies, the court determines (1) whether Congress "unequivocally intends" to abrogate immunity and (2) whether it "acts pursuant to a valid grant of constitutional authority." *Bd. of Trs. of the Univ. of Ala. v. Garrett,* 531 U.S. 356, 363 (2001).

Factor One. Congressional abrogation applies here. It is well-established that the Fair Housing Act of 1968 itself contains no express abrogation of Eleventh Immunity. However, in 1986, Congress passed Section 1003 of the Rehabilitation Act Amendments, a  residual clause in which Congress abrogated Eleventh Amendment immunity from suit in federal court for violation of certain nondiscrimination statutes:

> **(a) General provision**
>
> **(1)** A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973, title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, title VI of the Civil Rights Act of 1964, **or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance**.
>
> **(2)** In a suit against a State for a violation of a statute referred to in paragraph (1), remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State.

42 U.S.C. § 2000d-7 (emphasis added). Congress passed this law in response to the Supreme Court's holding in *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 235 (1985) that Congress had not unmistakably expressed its intent to abrogate the States' Eleventh Amendment immunity in the Rehabilitation Act. *Lane v. Pena*, 518 U.S. 187, 198 (1996).

The Supreme Court has interpreted this provision twice. In *Lane v. Pena*, the Court recognized that, "[b]y enacting § 1003, Congress sought to provide the sort of unequivocal waiver

that our precedents demand." 518 U.S. at 198. The Court then compared Section 1003(a)(1)'s "unambiguous waiver of the States' Eleventh Amendment immunity" to the more ambiguous treatment of "public entities" in Section 1003(a)(2). *Id.* at 200. In *Sossamon v. Texas*, 563 U.S. 277, 292 (2011), the Supreme Court stated that, "[e]ven assuming that a residual clause like the one in § 1003 could constitute an unequivocal textual waiver," it can only apply to federal statutes explicitly prohibiting "discrimination" that are similar to the specifically enumerated statutes, i.e., the Rehabilitation Act, Title IX, the ADA, and Title VI. *Sossamon v. Texas*, 563 U.S. 277, 292 (2011).

The Ninth Circuit has not addressed the application of 42 U.S.C. § 2000d-7 to FHA claims; and aside from one district court decision in the Eleventh Circuit, no court appears to have considered whether this statute abrogates Eleventh Amendment immunity from claims for violation of the FHA's nondiscrimination provisions.

In this case, the specific nature of Plaintiffs' claims of FHA discrimination claims fall squarely under the plain abrogation language of 42 U.S.C. § 2000d-7. First, the FHA contains provisions prohibiting discrimination by recipients of federal financial assistance. *Sossamon*, 563 U.S. at 292 ("a State might reasonably conclude that the [residual] clause covers only provisions using the term 'discrimination'"). Title 42, Section 3604 forbids discrimination in the sale or rental of housing based on race, color, religion, sex, familial status, or national origin. 42 U.S.C. §§ 3604(a)-(e). Section 3603 applies Section 3604 to dwellings provided in whole or part with the aid of loans, advances, grants, or contributions by the federal government. 42 U.S.C. § 3603(a)(1)(B). This is the type of nondiscrimination protection, applicable to recipients of

federal funding, contained in the nondiscrimination statutes specifically enumerated in the residual provision abrogating Eleventh Amendment immunity.[1]

Under the plain language of 42 U.S.C. § 2000d-7, Congress intended to abrogate Eleventh Amendment immunity for violations of the nondiscrimination provisions of FHA for recipients of federal funds.

This conclusion is consistent with this Court's interpretation of 42 U.S.C. § 2000d. In *Yu v. Idaho State University*, No. 4:15-cv-00430-RE, 2018 WL 576828, at *6-8 (D. Idaho Jan. 26, 2018), this Court addressed whether 42 U.S.C. § 2000d-7 abrogated immunity for a § 1983 claim simply because Yu brought that claim along with a Title VI claim. The Court interpreted the plain language of the statute to abrogate Eleventh Amendment immunity only for "claims brought under the statutes expressed in paragraph (1), including Title VI," i.e. "for a violation of" specific, enumerated federal laws. *Id.* at *7. The Court did not address the present situation where a claim

---

[1] *See* 29 U.S.C. § 794 (Rehabilitation Act § 504) ("No otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance..."); 20 U.S.C. § 1681 (Title IX) ("No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance…."); 42 U.S.C. § 6102 ("no person in the United States shall, on the basis of age, be excluded from participation, in be denied the benefits of, or be subjected to discrimination under, any program or activity receiving Federal financial assistance"); 42 U.S.C. § 12112(a) (ADA) ("No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.") & § 12134(b) ("Except for 'program accessibility, existing facilities', and 'communications', regulations under subsection (a) of this section shall be consistent with this chapter and with the coordination regulations under part 41 of title 28, Code of Federal Regulations (as promulgated by the Department of Health, Education, and Welfare on January 13, 1978), applicable to recipients of Federal financial assistance under section 794 of title 29."); 42 U.S.C. § 2000d (Title VI) ("No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.").

is brought under a provision of a federal statute prohibiting discrimination by recipients of federal financial assistance but recognized that § 1003 abrogated immunity for the violations it does list. *See also Joseph v. Boise State University*, 998 F. Supp. 2d 928, 944 (D. Idaho 2014) (§ 1003 "expressly abrogated States' sovereign immunity against suits brought in federal court to enforce Title VI"); *Holley v. California Dept. of Corrections*, 599 F.3d 1108, 1113-1114 (2010) (§ 1003 does not apply to the Religious Land Use and Institutionalized Persons Act because that act does not prohibit discrimination, but rather substantial burdens on religious exercise regardless of discriminatory intent). *Cf. Kadel v. North Carolina State Health Plan*, 12 F.4th 422, 434-435 (4th Cir. 2021), *cert. denied*, 142 S. Ct. 861 (2022) (§ 1003(a) abrogated Eleventh Amendment immunity for claims brought under provision of Affordable Care Act prohibiting discrimination by recipients of federal financial assistance).

"Congress says in a statute what it means and means in a statute what it says there." *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (cited in *Kadel*, 12 F.4th at 434). To that end, "when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Id.* Courts must "give effect, if possible, to every clause and word of a statute." *Advoc. Health Care Network v. Stapleton*, 518 U.S. 468, 478 (2017) (cited in *Kadel*, 12 F.4th at 432). Applying these principles, the natural reading of § 1003(a) is that Congress intentionally abrogated Eleventh Immunity for Plaintiff's claims under the provisions of the FHA that prohibit discrimination as to dwellings obtained with federal financial assistance.

Factor Two. To determine whether Congress acted pursuant to a valid grant of constitutional authority, the court conducts a case-by-case analysis of the allegations of misconduct. Section 5 of the Fourteenth Amendment grants Congress the power to enforce the

substantive guarantees contained in Section 1 of that Amendment by enacting "appropriate legislation." *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 365 (2001). In *Tennessee v. Lane*, 541 U.S. 509, 518 (2004), the Court examined whether Title II of the ADA validly abrogates state sovereign immunity. In support of its holding, the court noted that Title II prohibits not only "irrational disability discrimination" in violation of the Equal Protection Clause, but also "a variety of other basic constitutional guarantees" protected by the Fourteenth Amendment. *Id*. at 522–23. The Court ultimately held that Congress validly abrogated Eleventh Amendment immunity in "the class of cases implicating the fundamental right of access to the courts." *Id.* at 533–34. The Court left open whether other violations of the Fourteenth Amendment could establish whether Congress validly abrogated state sovereign immunity.

In *United States v. Georgia*, 546 U.S. 151 (2006), the Court confirmed that Section 5 of the Fourteenth Amendment validly abrogates sovereign immunity for conduct that actually violates the Fourteenth Amendment. *Id*. at 159. To determine whether Congress validly abrogated state sovereign immunity for specific conduct, *Georgia* requires courts to examine: "(1) which aspects of [defendants'] alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Georgia*, 546 U.S. at 159.

In the wake of *Georgia* and *Lane*, courts have engaged in a case-by-case analysis to determine whether a fundamental right is at issue and whether Title II validly abrogates state sovereign immunity. *See, e.g.*, *Phiffer v. Columbia River Corr. Inst*., 384 F.3d 791, 793 (9th Cir. 2004) (O'Scannlain, J., concurring) (noting that *Lane* requires "nuanced, case-by-case analysis"). "Neither *Lane* nor *Georgia* require that a constitutional violation be separately enunciated, just

that the Title II claims be evidently based, at least in large part, on conduct that independently

violates the constitution.'" *Kohn v. State Bar of California*, 497 F. Supp. 3d 526, 535 (N.D. Cal.

2020), *aff'd in part and remanded on other grounds*, 87 F.4th 1021 (9th Cir. 2023) (cleaned up).

      Here, Plaintiffs' FHA claims are based in large part on conduct that independently violates

the Fourteenth Amendment. Plaintiffs allege that because of the discriminatory harassment they

endured, they were forced to leave Idaho—and that the University's deliberate indifference caused

this. These allegations demonstrate that Congress's abrogation of immunity was validly authorized

by Section 5 of the Fourteenth Amendment—which also formed at least part of the Congressional

authority for the FHA's initial passing. *See Safe Air for Everyone v. Idaho*, 469 F. Supp. 2d 884,

887 (D. Idaho 2006) (Congress validly abrogated sovereign immunity for Plaintiffs' RA and ADA

discrimination claims because those claims were based on the Equal Protection Clause of the

Fourteenth Amendment, Congress enacted both the ADA and the RA under the Fourteenth

Amendment to prohibit discrimination against the disabled, both statutes were within the scope of

appropriate legislation under the Equal Protection Clause, and Congress had validly abrogated the

states' Eleventh Amendment sovereign immunity under Title II).

      **B.**    **ADA Claim**

      The University asserts that it is also entitled to immunity under the Eleventh Amendment

related to Plaintiffs' Americans with Disabilities Act Claim. Here, it is well settled that Congress

unequivocally expressed its intent to abrogate State immunity for Title II claims: "A State shall

not be immune under the eleventh amendment to the Constitution of the United States from an

action in [a] Federal or State court of competent jurisdiction for a violation of this chapter." 42

U.S.C. § 12202; *see also* 42 U.S.C. § 2000d-7(a)(1); *Bd. of Trustees of Univ. of Alabama v.*

*Garrett*, 531 U.S. at 364.

In the present case, the misconduct that violated Title II includes failure to provide reasonable accommodation for mental and physical disabilities, particularly with respect to remote options for attending law school classes and examinations. First, each of the Plaintiffs first faced severe harassment at the University which was not adequately addressed by the University and drove the Plaintiffs to seek remote learning for their own health, safety, and ability to learn. The Plaintiffs also faced serious struggles in even achieving the accommodation of remote learning. (Dkt. 24, ¶¶ 151, 154, 166-67, 184-87.) Then, when they did, the University did not provide an effective means for remote attendance. The remote education technology was not always working or had sound issues that went ignored because professors failed to check emails and Zoom chat messages alerting them to the technological failures occurring in real time. (*Id.* ¶¶ 173, 191.) This often led to the student functionally missing the class. (*Id.*) Rather than addressing the issues, the University told the students they should simply watch the recorded session at a later date, depriving them of the advantages of a live lecture. (*Id.* ¶ 174.) Even when the technology functioned, professors did not properly involve remote attendees: they neither answered their questions nor included them in class discussions. (*Id.* ¶¶ 152, 173, 191.) In some instances, classes that Plaintiffs wanted to take, or even were *required* to take, were simply not made available at all. (*Id.* ¶ 175, 189.) One Plaintiff was even denied the ability to take exams in an accommodated manner, and under circumstances that were retaliatory of his requests for accommodations. (*Id.* ¶¶ 192-97.) As a result, the Plaintiffs did not receive the same educational experience that other law students did, being largely left to self-study. (*Id.* ¶¶ 159-60, 178-79, 201.)

Disabled people do not constitute a suspect class, but the Equal Protection Clause "prohibits irrational and invidious discrimination against them." *Dare v. California*, 191 F.3d 1167, 1174 (9th Cir. 1999) (*citing Cleburne Living Ctr.*, 473 U.S. at 439, 446). Accordingly, the

allegations are subject to rational basis review. To prevail on an Equal Protection claim, plaintiffs must show that a class that is similarly situated has been treated disparately. *Arizona Dream Act Coal. v. Brew*er, 855 F.3d 957, 966 (9th Cir. 2017) (cleaned up). If the group classified by the government actor—here, remote learners—is similarly situated to a control group with respect to a policy—here, in-class learners—then Defendant must have a rational basis for treating the two groups differently. *Id.*

In this case, the University had no rational basis for treating its disabled students differently because it had the simple ability to treat them the same. There is no and can be no rational basis for failing to respond to communications from students that the remote equipment is not working or there is no sound. Methods exist in the software by which a remote learner can be included in the classroom experience—asking or being asked questions—but then treated them like passive watchers rather than active learners. There is no rational basis for choosing to ignore the student's questions and attempts to participate. One student was denied testing accommodations until he purchased thousands of dollars of equipment, because the University would not print a hard copy of an exam. Simply put, Plaintiffs were disproportionately burdened compared to their in-class classmates, for no rational reason at all.

Defendant directs the Court to the distinguishable case *Kohn v. State Bar of California*, 497 F. Supp. 3d 526, 535–36 (N.D. Cal. 2020), *aff'd in part and remanded*, 87 F.4th 1021 (9th Cir. 2023), in which the Northern District of California concluded that the California State Bar was immune from the plaintiff's ADA claim because the plaintiff had not articulated a violation of the Fourteenth Amendment. In *Kohn*, the plaintiff received some but not all requested accommodations for taking the California bar exam. As relevant here, the court found that Kohn's complaint failed to establish an Equal Protection claim because the Bar's COVID-19-related

policies met rational basis review: the remote testing policy neither facially discriminated against nor disproportionately burdened disabled test takers. The remote-testing conditions did not deny disabled test-takers with equal and meaningful access to the bar exams and applied to tall test takers. The court concluded that, under *Lane*, the State Bar had Eleventh Amendment immunity. Notably, the plaintiff in *Lane* did not allege that the accommodations he received were not provided as agreed.

Here, in contrast, the University granted Plaintiffs accommodations and then failed to implement those accommodations in a reasonable manner. The University's conduct can be constitutional only if there is a rational relationship between the disparity of treatment of the Plaintiffs and some legitimate governmental purpose. *Heller v. Doe*, 509 U.S. 312, 320 (1993) (citations omitted). No legitimate government purpose exists for its treatment of Plaintiffs. The technology *actually existed* for allowing the Plaintiffs to learn—as nearly as possible under the circumstances—in the same manner as the in-person learners. It was part of the accommodation that the University agreed to provide. Rather than using the tools technology *actually in place* to give the Plaintiffs the best learning experience possible under challenging circumstances, however, the University failed to employ those tools. No rational basis for failing to turn on a microphone and to ignore messages from the remote students that some technological failing on the University's side was preventing them from evening *hearing* the lecture, much less that event occurring over and over again. No rational basis exists for the University to treat the Plaintiffs as though they were not present at all by ignoring their questions and comments in a way that it did not do for the in-person learners. There is simply no reasonably conceivable state of facts or government purpose that could justify the neglect exhibited toward the remote learners.

The Fourteen Amendment Equal Protection violations in this case fit validly abrogate sovereign immunity as anticipated by Congress in the ADA. As such, this claim should not be dismissed.

### C.    The Section 1983 Claim

Defendants assert that the Eleventh Amendment outright bars claims against the state and its institutions when a § 1983 claim is brought. While this is generally the case, *see e.g., Flint v. Dennison*, 488 F.3d 816, 825 (9th Cir. 2007) (noting that universities are not persons within the meaning of § 1983 and are therefore generally entitled to Eleventh Amendment immunity), there is nevertheless an exception to this rule when injunctive relief is sought. As the Ninth Circuit has said:

> [there is] one vital exception to this general rule: When sued for prospective injunctive relief, a state official in his official capacity is considered a "person" for § 1983 purposes. *Will*, 491 U.S. at 71 n. 10, 109 S.Ct. 2304 ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.' " (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985))). This exception recognizes the doctrine of *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), that a suit for prospective injunctive relief provides a narrow, but well-established, exception to Eleventh Amendment immunity. *See Rounds v. Or. State Bd. of Higher Educ.*, 166 F.3d 1032, 1036 (9th Cir.1999) ("Ex Parte Young provided a narrow exception to Eleventh Amendment immunity for certain suits seeking declaratory and injunctive relief against unconstitutional actions taken by state officers in their official capacities."); *Doe v. Lawrence Livermore Nat'l Lab.*, 131 F.3d 836, 840 (9th Cir.1997) ("[T]he Eleventh Amendment allows only prospective injunctive relief to prevent an ongoing violation of federal law.").

*Flint*, 488 F.3d at 825. When injunctive relief seeks to prevent *future harm*, the Eleventh Amendment does not bar the claim. Plaintiffs, in their First Amended Complaint, request just such prospective injunctive relief. In their prayer for relief, they request the following:

A permanent injunction:

1. Requiring Defendant to make all necessary modifications to its policies, practices, and procedures to comply with the Fair Housing Act;

2. Requiring Defendant and its officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, to undergo training on the requirements of the Fair Housing Act;

3. Against Defendant from engaging in all unlawful practices alleged in this complaint;

4. Requiring Defendant to take affirmative action to provide equal housing opportunities to all persons regardless of their LGBTQIA+ status;

6. Ordering Defendant to provide reasonable accommodations through remote attendance and testing procedures that provide a substantially equal educational experience to that of students who do not require such accommodations;

7. Ordering Defendant to conduct training of its staff regarding compliance with Title VI and Title IX; and

8. Ordering Defendant to implement and execute policies and procedures to prevent and respond to hostile discriminatory environments created by staff and/or students; . . . .

As the requested relief falls squarely in the exception for Eleventh Amendment immunity in § 1983 cases, it should not be dismissed.

## II.   Plaintiffs Have Adequately Pleaded their Claims

The University next challenges the sufficiency of Plaintiffs' pleading, arguing that the First Amended Complaint contains impermissible "shotgun" pleading and that Plaintiffs otherwise did not adequately plead their FHA claim, Title VI claim, ADA/Rehabilitation Act claim, or Title IX claim. The Rule 8(a) pleading standard applies: that is, whether the complaint gives the defendant fair notice of what the claim is and the grounds upon which it rests, and whether the factual allegations are enough to raise a right to relief above the speculative level. *Twombly*, 550 U.S. at 555. Plaintiffs' complaint meets this standard.

### A.   Plaintiffs have not engaged in so-called "shotgun" pleading

Defendant first complains that the complaint rests on impermissible "shotgun" pleading. There are four types of shotgun pleading. *Tuinstra v. Bonner Cnty.*, No. 2:21-CV-00074-DCN, 2021 WL 2534983, at *2 (D. Idaho June 21, 2021). "The most common type ... is a complaint

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS
FIRST AMENDED COMPLAINT (DKT. 24) – 14

containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint." *Id*. at 1321. Plaintiffs, who have been exhaustive in pleading the underlying facts, are not engaged in "shotgun" pleading. Rather, the same set of facts provides the basis for the elements of several different causes of actions. For brevity's sake, Plaintiffs have incorporated the underlying *facts* into each count. "The next most common type" is a complaint "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action." *Id*. at 1321–22. Plaintiffs have not done this; they have been specific and clear about the conduct complained of. A third category is "not separating into a different count each cause of action or claim for relief." *Id*. at 1323. Plaintiffs have separated each cause of action into a different count. Lastly, there is "asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *Id*. In each of the counts, Plaintiffs identify that each count applies to "The University, its agents, and the other Defendants."

**B.   Plaintiffs have Adequately Alleged Violations of the Fair Housing Act**

The FHA forbids recipients of federal funds from "making unavailable or denying a dwelling to any person because of race, color, religion, sex, familiar status, or national origin." 42 U.S.C. § 3604(a). It also makes it unlawful to interfere with the exercise or enjoyment of any rights protected by Sections 3603, 3604, 3605, or 3606. 42 U.S.C. § 3617.

Plaintiffs allege that the University's discriminatory conduct effectively denied Plaintiffs their dwellings because of their race, national origin, and sex (sexual orientation). Plaintiffs allege that the University extends its control over Plaintiffs' dwellings, and the dwellings where discriminatory conduct occurred, by extending its policies and codes to the entire "University Community" including off-campus locations; and by advertising such dwellings on its website.

Plaintiffs also allege, in detail, the University's discriminatory conduct that ultimately forced Plaintiffs to flee Idaho: precisely the result the FHA was designed to prevent.

The University's narrow interpretation of the FHA would leave unchecked police members and citizens who would run folks out of town because of their color, or terrify and vandalize peoples' homes until they left the community. This would be an absurd result. The Fair Housing Act is intended to protect people of color, race, religion, sex, and different national origins from laws and people who would exclude them from their housing and subjected to sundown laws in sundown towns.

For example, 42 U.S.C § 3604(a) specifically makes it illegal: "To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." Plaintiffs' claims allege:

- "The University, its agents, and the other Defendants have discriminated and otherwise made unavailable or denied, a residence in the community on the basis of race [in violation of] 42 U.S.C. §3604(a)." (Dkt. 24 ¶ 204.)

- "The University, its agents, and the other Defendants have discriminated and otherwise made unavailable or denied, a residence in the community on the basis of "national origin." 42 U.S.C. §3604(a)." (*Id.* ¶ 212.)

- "The University, its agents, and the other Defendants have discriminated and otherwise made unavailable or denied, a residence in the community on the basis of "sex." 42 U.S.C. §3604(a)." (*Id.* ¶ 221.)

- "Defendants have engaged in interference in the exercise or enjoyment of rights granted the victims by 42 U.S.C. §§3603 and 3604. 42 U.S.C. §3617." (*Id.* ¶ 230.)

The facts set forth throughout the Complaint demonstrate that the University, through its agents, discriminated against Plaintiffs based on their race, color, and/or sex through deliberate indifference to their complaints and the hostile environment, and direct discrimination by CDAR as well professors both in and out of class. Plaintiffs specifically allege that, as a result, they fled Idaho. This is the sine qua non of a claim that a defendant "ran the plaintiff out of town" because of race: the very essence of the remedial nature of the FHA. *Cf. Tcherepnin v. Knight*, 389 U.S. 336, 468 (remedial legislation should be broadly construed to effectuate its purpose). The FHA's purpose is to correct the exclusion of people of protected classes broadly from towns, communities, neighborhoods and most narrowly buildings.

The University failed to monitor and enforce its nondiscrimination rules and laws, and failed to exercise its authority over students, staff, and faculty under its rules and policies for conduct on and off campus. For example: Defendant Seamon's conduct at the Moment of Community and harassment in the classroom; Professor Pimentel's comments to Kelly Doe which she reported; the failures of Green, Kalb, and Wertz to act when they became aware of discriminatory harassment; threatening and harassing behavior by other students that went unchecked. The University had the authority but failed to end neighbor-on-neighbor harassment, which is a form of interference prohibited by § 3617.

### C.    John Doe and Kelly Doe have Adequately Alleged Title VI Violations

The University delineates its argument to dismiss Kelly Doe's Title VI claim, but does not set forth any specific argument as to John Doe's claim other than a passing reference in a footnote. Plaintiffs infer that the University contends that John Doe has not alleged facts sufficient to support a claim for violation of Title VI. The University is incorrect as to both plaintiffs.

Section 601 of Title VI of the Civil Rights Act of 1964 provides, "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be

denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. *See Colwell v. Department of Health & Human Services*, 558 F.3d 1112, 1116 (9th Cir. 2009). Title VI prohibits a recipient of federal funds from discriminating on the basis of race, color, or national origin. 42 U.S.C. § 2000d. Public educational institutions that receive federal funds are subject to this mandate. 34 C.F.R. § 100.13(i) (2000). This claim requires a showing of (1) membership in a protected class, (2) meeting the school's legitimate educational expectations, (3) an adverse educational action, and (4) worse treatment than that of similarly situated students not in the protected class. *Joseph v. Boise State Univ.*, 998 F. Supp. 2d 928, 944 (D. Idaho 2014).

As with Title IX, liability for hostile environment arises under Title VI if a plaintiff establishes: (1) substantial control over the harasser and context; (2) severe, pervasive, objectively offensive, discriminatory harassment;(3) actual knowledge, and (4) deliberate indifference, i.e., a clearly unreasonable response in light of the known circumstances. *Davis v. Monroe County Board of Education*, 526 U.S. 629, 643–50 (1999); *see also Zeno v. Pine Plains Cent. School Dist.*, 702 F.3d 655, 664–66 (2nd Cir. 2012). Thus, discrimination under Title VI is not limited to being excluded from, or denied the benefits of, a particular school program. 42 U.S.C. § 2000d; *666 34 C.F.R. § 100.3(a). Discriminatory actions "[r]estrict an individual in any way in the enjoyment of any advantage or privilege enjoyed by others receiving any service, financial aid, or other benefit" under the school system. 34 C.F.R. § 100.3(b)(1)(iv); *see also id.* § 100.13(g)(2)(ii). Educational benefits include an academic environment free from racial hostility. *See Hayut v. State University of New York*, 352 F.3d 733, 750 (2nd Cir. 2003) ("We also find that ... [misconduct that] simply created a disparately hostile educational environment relative to her peers ... could be construed as depriving [the victim] of the benefits and educational opportunities available at [the school].").

The University contends that Plaintiffs' claims fail because they detailed "corrective action" taken by the University. In the *Joseph* case, the Title VI claim was dismissed because it did not state a plausible claim of discrimination, but in fact showed that university officials were earnestly trying to assist the plaintiff in that case with her issues and there was no plausible way to infer that various failures were racially motivated. Here, however, Kelly Doe and John Doe have so pleaded.

Kelly alleges that she is a person of color who identifies as Black or African American. (Dkt. 24 ¶ 14.) In ¶¶ 62-69 and 71-82 she outlines specific events showing how she experienced racist behavior from students and staff. In one particular instance, she pleads how, after students of color solicited an apology from a professor who told a black student that he must know all about car theft, that professor began to treat students of color, including Kelly Doe, in a noticeably different manner than their white classmates, including excluding her from participation. (*Id.* ¶ 73.) She outlines how this pattern of racially hostile discourse, which largely went unchecked by the University, left her alienated by students and staff. (*Id.* at 86.) She has abundantly shown that, because of her race, she received worse treatment than that of similarly situated students not in the protected class. As such, this claim should not be dismissed.

Likewise, John Doe alleges that he is a person of color, and that he experienced discriminatory treatment as a result of his race. He alleged the discriminatory and violent conduct by a student, Jake Dingle, as a result of sexual orientation and race, which the University failed to properly address, ¶¶ 94-100 & 105-112; racist harassment by that same student at the library, ¶ 91; the University's failure to support and respond to the students' (including John's) safety concerns because of race, ¶ 103; and that he ultimately fled Idaho because of fears for his safety, ¶¶ 180-201. As such, this claim should not be dismissed.

**D.      Plaintiffs have Adequately Alleged Violations of Title II of the ADA and Section 504 of Rehabilitation Act**

Title II of the ADA and Section 504 prohibit discrimination on the basis of disability. 42 U.S.C. § 12132; 29 U.S.C. § 794. The two laws are interpreted coextensively. *Payan v. Los Angeles Comm. Coll. Dist.*, 11 F.4th 729, 737 (9th Cir. 2021). To show a violation of Title II of the ADA, a plaintiff must show: "(1) he is a qualified individual with a disability; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability." *Id.* (internal quotations omitted). At the pleading stage, a court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from well-pleaded facts. *Walleri v. Fed. Home Loan Bank of Seattle*, 83 F.3d 1575, 1580 (9th Cir. 1996). Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory. *Balistreri v. Pacifica Police Dep't.*, 901 F.2d 696, 699 (9th Cir. 1990).

Here, Plaintiffs have pleaded sufficient facts to state a claim. First, Plaintiffs sufficiently plead physical and mental disability. *See* Dkt. 24 ¶¶ 13, 14, 15, 151, 166, 168, 170, 184. Second, in section I.B above, Plaintiffs extensively outline their allegations that the University failed to provide reasonable accommodations that interfered with and denied them the education provided to other students. Contrary to Defendant's argument, Plaintiffs do not complain that they should have obtained "every accommodation of their choosing," but rather that the University's ineffective implementation of accommodation caused them to be excluded from participation. A university must provide academic adjustments, auxiliary aids, and reasonable modifications (collectively "accommodations") to avoid discrimination. 28 C.F.R. § 35.130(a), (b)(7); 34 C.F.R. § 104.44(a), (d). "[T]he duty to accommodate is a continuing duty that is not exhausted by one

effort." *U.S. E.E.O.C. v. UPS Supply Chain Solutions*, 620 F.3d 1103, 1111 (9th Cir. 2010). "[T]he employer's obligation to engage in the interactive process ... continues when the employee asks for a different accommodation *or where the employer is aware that the initial accommodation is failing and further accommodation is needed*." *Id.* (emphasis added). Repeatedly failing to correct technical errors or use the most basic interactive elements built into the remote learning software is essentially *no accommodation at all*. *Id.* at 1010 ("An *ineffective* 'modification' or 'adjustment' will not *accommodate* a disabled individual's limitations. Ineffective modifications therefore are not accommodations.") (emphases in original; cleaned up). As set forth above, Plaintiffs have adequately pleaded that the University failed to provide them with accommodations after receiving notice. Accordingly, Plaintiffs' claim has been sufficiently pleaded and should not be dismissed.

E.      **Plaintiffs have Adequately Alleged a Title IX Claim**

Title IX provides, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). To state a Title IX claim, a plaintiff must plead that: (1) the defendant educational institutional receives federal funding; (2) the plaintiff was excluded from participation in, denied the benefits of, or subjected to discrimination under any education program or activity, and (3) the latter occurred on the basis of sex. *Schwake v. Arizona Board of Regents*, 967 F.3d 940, 946 (9th Cir. 2020). To obtain damages under Title IX for student-on-student or faculty-on-student harassment, a plaintiff must show (1) that the educational institution had "substantial control over both the harasser and the context in which the known harassment occurs"; (2) that the harassment was so "severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect"; (3) that a school official with authority to address the alleged discrimination and to institute corrective measures has actual knowledge or notice of

discrimination; (4) that the school acted with "deliberate indifference" to the harassment; and (5) that the school's deliberate indifference, at a minimum, caused students "to undergo harassment, or make them liable or vulnerable to it." *Brown v. Arizona*, 82 F.4th 863, 874 (9th Cir. 2023) (cleaned up). *See also Karasek v. Regents of Univ. of California*, 956 F.3d 1093, 1105 (9th Cir. 2020).

Each of these elements is pleaded in detail throughout the factual section of the First Amended Complaint, and then again in the specifics of Count Five where multiples specific instances of discrimination based on sex and the University's deliberate decision to respond in a manner that amounted to a decision not to remedy the discrimination.

The University asks the Court to dismiss Plaintiffs' Title IX claim to the extent it comprises a "pre-assault" claim. A "pre-assault" claim involves a slightly different analysis; it is not directed at specific discrimination suffered by a Plaintiff, but rather a general problem at the institutional level that places a plaintiff at higher risk of discrimination. *Karasek v. Regents of Univ. of California*, 956 F.3d 1093, 1112 (9th Cir. 2020). When a plaintiff alleges that a school's "official policy" violates Title IX. *Id.* (citation omitted). In that context, the school has "intentionally violate[d] the statute." *Id.* (citation omitted). A school need not have had actual knowledge of a specific instance of sexual misconduct or responded with deliberate indifference to that misconduct before damages liability may attach. *Id.* (*citing, e.g.*, *Mansourian v. Regents of Univ. of Cal.*, 602 F.3d 957, 967 (9th Cir. 2010) ("[W]here the official policy is one of deliberate indifference to a known overall risk of sexual harassment, notice of a particular harassment situation and an opportunity to cure it are not predicates for liability.")). Thus, a pre-assault claim should survive a motion to dismiss if the plaintiff plausibly alleges that (1) a school maintained a policy of deliberate indifference to reports of sexual misconduct, (2) which created a heightened

risk of sexual harassment that was known or obvious (3) in a context subject to the school's control, and (4) as a result, the plaintiff suffered harassment that was "so severe, pervasive, and objectively offensive that it can be said to [have] deprive[d] the [plaintiff] of access to the educational opportunities or benefits provided by the school." *Id.* (citing *Davis*, 526 U.S. at 650).

While it is entirely possible that such institutional discrimination exists, Plaintiffs in fact suffered from *actual* discriminatory instances. As such, the discussion of institutional inference pleaded in the First Amended Complaint go to demonstrating the fourth element, i.e., that the school acted with "deliberate indifference" to the harassment, such that the school's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances and amount to an official decision not to remedy.

Regardless of the precise theory, Plaintiffs have adequately pleaded deliberate indifference. The University purports to have policies directed at preventing such conduct, including codes and policies prohibiting sexual or gender-based harassment, and sanctions relating to such behavior. (Dkt. 24 ¶¶ 39-45.) Despite this, Plaintiffs have outlined extensive incidents concerning harassment on the basis on gender and sexual orientation by students and staff of the University, as well as a history establishing deliberate indifference. For example:

- Complaints of gender discrimination that went un-investigated (*Id.* ¶ 53.)

- Documented gender bias in the law school faculty and staff (*Id.* ¶ 54.)

- Forums in which students raised concerns about gender discrimination, without any remedial action by the University. (*Id.* ¶¶ 58-59.)

- Statements by a professor during a constitutional law lecture including intentionally misgendering a transgender female student and using her "dead name" (*Id.* ¶ 90.)

- Mocking and derogatory comments directed at LGBTQIA+ persons by a student. (*Id.* ¶ 91.)

- Derogatory and then physically threatening behavior by the same student regarding a Plaintiff's sexual orientation. (*Id.* ¶ 91.)

- The University responded to this behavior by issuing *mutual* no contact orders between John Doe and the other student. The University assured John Doe that additional security would be procured, but it was not. (*Id.* ¶ 99.) Despite being found to have committed a severe act against Plaintiff, the student was permitted to continue to attend classes that Plaintiff also took. (*Id.* ¶ 100.)

- Repeated harassment by students based on sexual orientation and gender identity. (*Id.* ¶ 101.)

- The University stated that it explicitly would *deny* the Plaintiff any accommodations if based only on his safety concerns regarding being in the class with his assaulter and discomfort with the professor who made actively transphobic comments. (*Id.* ¶ 104.)

- The University's final response to the physical assault on Plaintiff by another student was that there was "insufficient evidence" of intimidation or hostility. (*Id.* ¶¶ 105-106).

- When Plaintiff attempted to appeal the issue, the appeal was scheduled directly in the middle of midterm examinations. (*Id.* ¶ 107.)

- Pressure by students for Plaintiff to "drop" his complaint against the other student, followed by severe harassment when he refused to do so. (*Id.* ¶ 108.)

- Statements by students that they would "like to round up all the queers and execute them." (*Id.* ¶ 111.)

- At a "moment of community" designed to address some of the hatred that had been directed at LGBTQIA+, other students called plaintiffs "fornicators" and told them "Homosexuality is a sin," they are all "going to the guillotines of Hell," they "have no rights," and they "are not welcome at the law school." One CLS member verbally attacked Plaintiff Jane Doe directly saying because she is gay, she "was a sinner and could never get into the kingdom of heaven." (*Id.* ¶ 125.) The University's faculty members, professors, and deans of the law school who attended the Moment of Community and witnessed this behavior and remarks, and failed to take any action or make any attempt to stop this harassment. (*Id.* ¶ 126.)

- Moments before his Constitutional law lecture immediately following this incident, a Professor stated that "The bible does say you are going to hell" and that the harassing statements were "true." The Professor then stated he needed to get to class, passively reminding LGBTQIA+ students that their tardiness or absence would not be excused. (*Id.* ¶ 128.)

- Following these events, the ABA student board invited students to come speak with them about their experiences at the law school. During his class, Professor Pimentel encouraged only students "that had nice things to say" or that are "positive" to attend the ABA meeting, despite being aware of the prior events. (*Id.* ¶ 137.)

- A student left a harassing note in Plaintiff Jane's carrell. She was told that OCRI would investigate. Jane was later told by the Director of OCRI Lindsay Ewan that the

University never performed an investigation of Jane's complaint, and in fact that OCRI had received specific instruction, from someone internal at the University, to not perform an investigation. (*Id.* ¶ 143.)

- When Kelly reported that she had become the target of a rumor that she had harmed a white student's property, Dean Running told Kelly to "ignore it." (*Id.* ¶ 145.)

- Jane received a Facebook private message from a law student (who was also a Student Bar Association Student Representative) shaming Jane for openly talking about the discrimination LGBTQIA+ students were facing at the University and for participating in a walkout. The message specifically requested that Jane not speak publicly about her experiences and keep them private. (*Id.* ¶ 147.)

- The University took no action and conducted no investigation of reports that a group of students—include a classmate of Kelly who sat next to her in class—entered a Black professor's classroom and started loudly whispering "white power." (*Id.* ¶¶ 164-165.)

In many cases, the University was entirely non-responsive to complaints. In others, the perfunctory and wrist-slapping nature of the response is clearly unreasonable. Even when the Student Board finally found that a student's deployment of the term "faggot" against John Doe was hostile, the University's prior feeble responses had already enabled and emboldened harmed Plaintiffs and emboldened further derogatory conduct. Critically, the school's response did not deter future discriminatory harassment by students. In short, the Plaintiffs have adequately pleaded facts sufficient to demonstrate that the University acted with deliberate indifference to the harassment.

## **CONCLUSION**

For the foregoing reasons, the First Amended Complaint should not be dismissed. Alternatively, the Court should grant leave for Plaintiffs to amend.

DATED March 4, 2024

/s/ Monica Fabbi
Monica Fabbi, ISB No. 10018

/s/ Alyson Foster
Alyson A. Foster, ISB No. 9719

*Attorneys for Plaintiffs*