UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JANE DOE, an individual; KELLY DOE, an individual; JOHN DOE, an individual; and DOES I-X,<br><br>    Plaintiffs,<br><br>    v.<br><br>THE UNIVERSITY OF IDAHO, through its Board of Regents,<br><br>    Defendant. | Case No. 1:23-cv-00409-AKB<br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before the Court is Defendant University of Idaho's ("the University") Motion to Dismiss Second Amended Complaint (Dkt. 58). Having reviewed the record and the parties' submissions, the Court finds that the facts and legal arguments are adequately presented and that oral argument would not significantly aid its decision-making process, and it decides the motions on the parties' briefing. Dist. Idaho Loc. Civ. R. 7.1(d)(1)(B); *see also* Fed. R. Civ. P. 78(b) ("By rule or order, the court may provide for submitting and determining motions on briefs, without oral hearings."). For the reasons set forth below, the Court grants Defendant's motion to dismiss.

## I.    BACKGROUND

Plaintiffs are former law students who attended the University's College of Law and who are using the pseudonyms "Jane Doe," "Kelly Doe," and "John Doe." (Dkt. 55 at ¶¶ 4-6). Each is

a member of the LGBTQ+ community (*id.* at ¶¶ 10, 45, 77). Additionally, John is a Pacific Islander who has brown skin, and Kelly is Black/African American (*id.* at ¶¶ 45, 77).

Plaintiffs originally sued only the University but later amended their complaint to add six individual defendants (Dkts. 1, 24). Defendants moved to dismiss Plaintiffs' claims, and the Court granted those motions but allowed Plaintiffs leave to amend (Dkt. 53). Thereafter, Plaintiffs filed their second amended complaint again asserting claims only against the University.

In their second amended complaint, Plaintiffs each assert violations of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681; John and Kelly also assert violations of the Rehabilitation Act, 29 U.S.C. § 794, and Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12132; and Kelly and John assert violations of Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d-2000d-7. In response, the University moves to dismiss all Plaintiffs' claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## II.    LEGAL STANDARD

A dismissal under Rule 12(b)(6) is appropriate where a complaint fails to state a claim upon which relief can be granted. Rule 8(a)(2) requires only a short and plain statement of the claim, showing the plaintiff is entitled to relief and giving the defendant fair notice of plaintiff's claim and the grounds upon which it rests. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Although a complaint challenged by a Rule 12(b)(6) motion to dismiss "does not need detailed factual allegations," it requires "more than labels and conclusions." *Twombly*, 550 U.S. at 555. "[A] formulaic recitation of the elements of a cause of action will not do." *Id.*

To survive a Rule 12(b)(6) motion, a claim requires a complaint to have enough factual basis which, if true, states a plausible claim for relief. *Twombly*, 550 U.S. at 555. A claim has facial

**MEMORANDUM DECISION AND ORDER - 2**

plausibility when the plaintiff pleads factual content allowing the court to draw a reasonable inference that the defendant is liable for the alleged misconduct. *Id*. at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility a defendant has acted unlawfully. *Id*. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id*. at 557.

### III.    ANALYSIS

**A.    Title IX -- Counts One, Two, Three, and Six**

Plaintiffs' Counts One, Two, Three, and Six each allege Title IX violations. Title IX provides that "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). To state a Title IX claim, a plaintiff must plead that the defendant receives federal funding as an educational institution; the plaintiff was excluded from participation in, denied the benefits of, or subjected to discrimination under any education program or activity; and the latter occurred based on sex. *Schwake v. Arizona Bd. of Regents*, 967 F.3d 940, 946 (9th Cir. 2020). A plaintiff may allege a Title IX claim under various legal theories, and Plaintiffs here rely on three of those theories, including: (1) student-on-student sexual harassment based on the University's alleged failure to adequately respond to reports of harassment; (2) pre-assault liability based on the University's policy of deliberate indifference to reports; and (3) the University's alleged retaliation for protected activities.

### 1. Student-On-Student Harassment

To establish an individual sexual harassment claim, a plaintiff must allege five elements: (1) the school exercised substantial control over both the harasser and the context in which the harassment occurred; (2) the plaintiff suffered harassment so severe, pervasive, and objectively offensive that it deprived a plaintiff access to the school's educational opportunities or benefits; (3) a school official, who had authority on the school's behalf to address and institute corrective measures, had actual knowledge of the harassment; (4) the school acted with deliberate indifference to the harassment such that its response was clearly unreasonable based on the known circumstances; and (5) the school's deliberate indifference subjected the plaintiff to harassment. *Karasek v. Regents of Univ. of California*, 956 F.3d 1093, 1105 (9th Cir. 2020) ("*Karasek I*").

Here, the University argues Plaintiffs have not alleged that it "failed to act on any harassment of which it was aware" (Dkt. 58-1 at 4). It characterizes Plaintiffs' allegations as showing it "responded and acted when it was made aware of the alleged student-on-student conduct" (*id.* at 5). In opposition, Plaintiffs characterize the University's argument as "contending it was not deliberately indifferent";[1] assert the University was deliberately indifferent because its responses were clearly unreasonable under the known circumstances; and suggests those responses were unreasonable because they were delayed or placed improper pressure on the complaining party (Dkt. 59 at 5-6). In their briefing, the parties principally address Plaintiffs' allegations about

---

[1]    The University, however, disputes it solely argued it was not deliberately indifferent and reiterates that Plaintiffs' allegations fail to aver it had knowledge of the Pride flag incident and that students "pressured" John to drop his complaint regarding a CLS member's conduct (Dkt. 62 at 2-3).

three separate incidents involving purported student-on-student harassment: (a) conduct occurring during the University's "Moment of Community"; (b) a homophobic slur by a member of the Christian Law Society (CLS) about John; and (c) that same CLS member's denigration of the Pride flag (Dkt. 58-1 at 4) (articulating allegations of student-on-student harassment); Dkt. 59 (articulating same allegations).

### a. The Moment of Community

According to Plaintiffs, the University held an event called the "Moment of Community" "in response to pervasive anti-LGBTQ+ commentary and behavior, including 'faggot' written on the whiteboard" and "to provide support and healing for students and in particular LGBTQ+ students" (Dkt. 55 at ¶ 17). During the event, the CLS faculty advisor, Professor Richard Seamons, and students who were CLS members "took over the event [by] ask[ing] everyone to join hands for a prayer" (*id.* at ¶ 19). Plaintiffs allege that following this prayer, CLS members called Jane and other LGBTQ+ students fornicators and sinners and stated they were going to hell and were not welcome at law school (*id.* at ¶ 21). Additionally, Seamons allegedly told Jane that "it's true" she is going to hell (*id.*). "Jane and John immediately submitted a written complaint . . . requesting an immediate investigation by the University's Office of Civil Rights and Investigations [OCRI]" (*id.* at ¶ 31).

Plaintiffs allege the University failed to investigate their complaints about the Moment of Community (Dkt. 55 at ¶¶ 31-34; *see also* Dkt. 59 at 7) (characterizing allegations as relating to University's lack of response to complaints about event). Challenging this allegation, the University argues it "was enjoined from taking any further action in response to the events at the Moment of Community" under *Perlot v. Green*, 609 F. Supp. 3d 1106 (D. Idaho 2022), and as a

result, it cannot be deliberately indifferent for not investigating Plaintiffs' complaints about the event (Dkt. 58-1 at 6).

*Perlot* addressed the University's response to the conduct which occurred during the Moment of Community. After receiving a complaint about the event, the University's OCRI issued no-contact orders prohibiting three CLS members, who attended the event, from having any contact with Jane. *Id.* at 1114. Those CLS members then sued the University, alleging the no-contact orders violated their constitutional rights. According to the timeline in *Perlot*, the Moment of Community occurred on April 1, 2022. *Id.* The OCRI interviewed one of the CLS members on April 4. *Id.* It issued no-contact orders to each of the three CLS members on April 7. *Id.* Those CLS members then filed a complaint against the University on April 25, alleging the orders violated their constitutional rights (*Perlot*, 3:22-cv-00183-DCN, ECF Dkt. 1).[2] On April 26, the CLS members moved for a temporary restraining order and preliminary injunction seeking, among other relief, that the court "[t]erminate any investigation related to the no-contact orders . . . based on allegations of protected speech." *Perlot*, 609 F. Supp. 3d at 1127 n.34.

Then, on May 10, 2022, the OCRI issued a no-contact order against Seamons, and on May 17, joined *Perlot* as a plaintiff seeking injunctive relief. *Id.* at 1115. Thereafter, the district court ruled the CLS members and Seamons were likely to establish that the First Amendment and the Due Process Clause protected their speech during the Moment of Community, and the court

---

[2]    The Court takes judicial notice of the complaint in *Perlot* under Rule 201(b) of the Federal Rules of Civil Procedure.

granted their motion for injunctive relief, including terminating any investigation giving rise to the no-contact orders. *Id.* at 1111, 1127 n.34.

In response to the University's argument that it was enjoined, as a matter of law, from investigating Plaintiffs' complaints about the Moment of Community, Plaintiffs respond that *Perlot* has "no preclusive effect" on them because they were not parties to that case (Dkt. 59 at 8). The University does not rely on *Perlot* to establish any preclusive effect. Rather, it argues it cannot be deliberately indifferent for not conducting a further investigation into the Moment of Community because it was legally prohibited from doing so by the district court's injunction in *Perlot* (Dkt. 62 at 3-4).

Here, Plaintiffs allege the University told Jane in April and May 2022, that the investigation of the Moment of Community was ongoing (Dkt. 55 at 8). As the timeline in *Perlot* shows, the OCRI had indeed begun an investigation shortly after the Moment in Community in April, but a pending motion for injunctive relief impeded that investigation, which was necessarily ceased when the district court enjoined it. Although the court in *Perlot* ruled that "nothing in the Court's decision today prohibits an investigation into Jane Doe's allegations," it limited that permissible investigation to "things *other than* '*speech alone*'/'*pure speech.*'" *Id.* at 1127 n.34 (emphasis added). Plaintiffs, however, have not alleged any conduct which occurred during the Moment of Community other than offensive speech. For that reason, the court's injunction in *Perlot* prohibited the OCRI from further investigating the event.

The Court disagrees with Plaintiffs' assertion that "*Perlot* is irrelevant to whether Plaintiff's [sic] allegations concerning their experiences in the Moment of Community are adequately pled" (Dkt. 59 at 9). Because the district court in *Perlot* ruled the CSL members' and

Seamon's speech at the event was likely constitutionally protected and enjoined the University from investigating that speech, Plaintiff cannot allege an essential element of a Title IX claim based on the Moment of Community. Namely, they cannot allege that the University acted with deliberate indifference to reports of harassment and that its response was clearly unreasonable based on the known circumstances. The University's compliance with the *Perlot* court's injunction cannot be considered unreasonable as a matter of law.

### b. Homosexual Slur

To allege student-on-student harassment, Plaintiffs also rely on the University's investigation of a CLS member's homophobic slur about John. According to Plaintiffs' allegations, while a CLS member was attending a "social mixer," which John hosted at his apartment, the CLS member "cornered John in the kitchen and called him a 'faggot' ('How does it feel to be a faggot'?)" and then physically "charged toward John" (Dkt. 55 at ¶ 48). John reported the CLS member's conduct to the OCRI. In response, the OCRI issued mutual no-contact orders; investigated the matter; issued a final report; but could not conclude the CLS member's conduct was "based on sexual orientation" (*id.* at ¶¶ 49-50).

Dissatisfied with the OCRI's report, John requested an appellate hearing before the Student Conduct Board (SCB) (*id.* at ¶ 51). The Dean of Students "scheduled the hearing during John's midterm exam week"; initially denied John's request for "a different date to avoid interrupting his education and testing"; told him he could either agree to a hearing date during his midterm testing week, drop his appeal, or pursue an informal resolution (*id.* at ¶ 52). Further, Plaintiffs allege CLS members "cornered John at a student party to pressure him to drop his appeal" and made "degrading and harassing comments to him" (*id.* at ¶ 53). Ultimately, the Dean offered an

alternative hearing date as John had requested, and following the hearing, the SBC concluded the CLS member's conduct violated the University's student code of conduct (*id.* at ¶¶ 52, 54).

The University argues that its response to "the incident at John's apartment is insufficient for a Title IX claim" because that response included "conducting an investigation, interviewing witnesses, conducting a hearing with the [SCB], and finding in John's favor" (Dkt. 58-1 at 4). Plaintiffs do not address this argument directly; instead, they generally argue that "deliberate indifference and delay [are] baked into [the University's] responses" and that "inadequacy and pressure are inherent in the responses" (Dkt. 59 at 7-8).

Although Plaintiffs do not allege the University delayed processing John's complaint, they do allege the Dean "pressure[ed]" John when she offered him alternatives to proceeding to a hearing during his midterm exam week (Dkt. 55 at ¶ 52). Assuming this allegation is true, it is exceedingly thin, particularly because John ultimately obtained an alternative (and apparently acceptable) hearing date. To the extent the Dean "pressured" John to drop his investigation, her conduct of suggesting alternatives was not egregious enough to support a plausible Title IX claim.

For example, the Dean's alleged pressure in this case is much less significant than the alleged pressure in *Ware v. Univ. of Vt. and State Agric. College*, 722 F. Supp. 3d 379, 399 (D. Vt. 2024), on which Plaintiffs rely. In that case, the district court found Ware plausibly alleged the school had improperly pressured her into foregoing a formal investigation. *Id.* at 427. That pressure included: (1) an email suggesting a formal investigation would get the alleged offender in trouble and adversely impact his ability to play basketball; (2) a voicemail urging the plaintiff to reconsider her decision to pursue a formal investigation; and (3) administrators' representations misleading Ware about the possible consequences to the offender under the informal resolution process. *Id.* at

399-400, 423. Eventually, Ware succumbed to the school's pressure, dropped her request for a formal investigation, and pursued an informal resolution. *Id.* at 400. Here, in contrast, John's request for an alternative hearing date was granted, and he did not acquiesce to the Dean's proposed alternatives, did not drop his formal investigation, and received a resolution in his favor.

Plaintiffs also allege that "CLS members" pressured John to drop his investigation related to the homophobic slur. Regarding this pressure, the University argues Plaintiffs failed to allege it was "aware that students 'pressured' John to drop his complaint" (Dkt. 62 at 2). Indeed, the Court is unable to locate any allegation in the complaint asserting John notified the University that CLS members pressured him to drop his complaint or his appeal. Further, the Court notes Plaintiffs' allegations are unclear which CLS members allegedly pressured John. The complaint alleges "CLS members . . . cornered John at a party" and pressured him (Dkt. 55 at ¶ 53). Meanwhile, when summarizing these allegations in their opposition brief, Plaintiffs state that "a student representative from the OCRI hearing" who "represented" the offending CLS member pressured John (Dkt. 59 at 7). Regardless of whom was causing the pressure, Plaintiffs do not allege John reported that pressure to the University. Moreover, the fact that John was allegedly pressured, either by students or by the Dean, does not support a plausible Title IX claim for either Jane or Kelly. For these reasons, the Court finds Plaintiffs' allegations about the University's response to the homophobic slur at the social mixer fail to state a Title IX claim.

### c. Denigration of Pride Flag

Finally, in support of their Title IX claim Plaintiffs allege the same CLS member who used the homophobic slur also denigrated the Pride flag by "[s]porting the flag as a cape" and running and jumping around while making "'feminine' actions" and "holding the flag with his wrists tilted

downward" (Dkt. 55 at ¶ 13). The University argues its failure to investigate this conduct is not actionable because Plaintiffs do not allege the University was aware of the conduct (Dkt. 58-1 at 5). Plaintiffs dispute that they did not allege the University's knowledge of the flag's denigration (Dkt. 59 at 5 n.1). In support, they rely on a general allegation that they had meetings at a local café, sometimes involving University officials, at which they conveyed their concerns:

> During this time, students, professors, and deans met on several occasions at a local cafe to discuss current events in the law community, the growing safety concerns of students of color and LGBTQ+ students, and how they could support each other. Then-Dean Johanna Kalb and then-Associate Dean Kristi Running, among others, attended some of these meetings. Plaintiffs at these meetings conveyed that they felt unwelcome, intimidated, and concerned for their safety because of CLS derogatory conduct in class and on campus

(Dkt. 55 at ¶ 15; *see also* Dkt. 59 at 5 n.1) (quoting allegation).

Plaintiffs assert this general averment is sufficient to allege "the knowledge element" (Dkt. 59 at 5). They cite no authority, however, for the proposition that an allegation of unspecified meetings about unspecified incidents involving unidentified individuals is sufficient to aver the University had knowledge of a particular incident. Deliberate indifference is a "fairly high standard"; a "plaintiff must demonstrate that the school's actions amounted to an official decision not to remedy the discrimination." *Karasek I*, 956 F.3d at 1105 (cleaned up). Under this standard, Plaintiffs' general allegation about "meetings," which University officials sometimes attended, regarding students' general concerns is insufficient to aver the University's knowledge of the Pride flag's denigration or any other alleged incidents.

### 2. Pre-assault Liability

Plaintiffs also rely on pre-assault liability to assert their Title IX claims. Under this theory of liability, a defendant intentionally violates Title IX if it has an official policy that violates

Title IX. *Id.* at 1112. To survive a motion to dismiss a pre-assault claim, a plaintiff must allege that: (1) the school maintained a policy of deliberate indifference to reports of sexual misconduct, (2) which created a heightened risk of sexual harassment that was known or obvious, (3) in a context subject to the school's control, and (4) the plaintiff suffered harassment so severe, persuasive, and objectively offensive it deprived the plaintiff access to the school's educational opportunities or benefits. *Id.*

Relying on this theory of pre-assault liability, Plaintiffs allege the University has a "historical deliberate indifference" to a sexually hostile environment which "developed over a period of years" leading to a "policy of deliberate indifference" (Dkt. 55 at ¶¶ 39, 43). In support, they generally allege—"on information and belief"—that the "OCRI received numerous complaints of sex discrimination or retaliation" between 2011 and 2020; it refused or failed to conduct formal investigation into most of those complaints; the University's human resources department performed a review of some of those complaints and issued "an April 2018 report summarizing the review findings"; the "OCRI did not conduct any formal investigation or implement remediation steps in response to the review"; and the OCRI's investigator for the law school was a law student who "decided to not investigate any conduct" (Dkt. 55 at ¶¶ 39-44).

Challenging Plaintiffs' assertion of pre-assault liability, the University argues Plaintiffs have not alleged "anything more than conclusory, high-level allegations" (Dkt. 58-1 at 8). In support, the University contrasts Plaintiffs' allegations with those in *Karasek v. Regents of Univ. of California*, 500 F. Supp. 3d 967 (N.D. Cal. 2020) ("*Karasek II*"). In *Karasek II*, the court found the plaintiffs sufficiently alleged the school maintained both a campus-wide policy of deliberate

indifference to reports of sexual misconduct and a policy of deliberate indifference within the specific context of the school's Democrats Club. *Id.* at 988.

The *Karasek II* plaintiffs' allegations in support of a campus-wide policy of deliberate indifference included that the school's Title IX coordinator told a media outlet "she could not imagine a situation where using the [informal] resolution process for sexual assault cases would be appropriate," but the plaintiffs alleged that, contrary to this statement, "all but two of approximately 500 cases of sexual misconduct reported to [the school] in one year used the informal process." *Id.* at 984-85. According to the plaintiffs, the school's motivation for using the informal process was its belief that it did not have "to report complaints dealt with in that process under the Clery Act." *Id.* at 985.

Further, a state audit of the school's informal process found it was deficient because the school did not inform students of what to expect during the process and how to report retaliation; did not provide complainants with updates; and did not timely complete investigations. *Id.* The audit also found the school "failed to adequately educate students about sexual misconduct," failed to train faculty and staff "how to respond to complaints of sexual assault," and mishandled complaints placing students at risk. *Id.*

In support of a policy in the specific context of the Democrats Club, the *Karasek II* plaintiffs alleged three reports of sexual assault occurring among Club members. *Id.* at 971-72. The district court found that the school's failure to respond to three known reports of sexual assault in the Club in four years under the same circumstances (during Club trips and retreats) was sufficient to allege a specific problem in the Democrats Club. *Id.* at 986.

Here, in contrast, Plaintiffs' allegations of a policy of deliberate indifference to reports of sexual harassment at the College of Law are devoid of any specific facts and are conclusory (*see, e.g.*, Dkt. 55 at ¶¶ 39-44). Indeed, all Plaintiffs' allegations in support of their claim of pre-assault liability are based on "information and belief" (*id.*). Unlike *Karasek II*, Plaintiffs do not allege how many complaints of sex discrimination the OCRI received about the College of Law but did not investigate; do not describe the "documented issues of gender bias among the law school's faculty and staff"; do not explain the "continued . . . problems with sex discrimination"; and do not identify any reports of sexual harassment which the College of Law's OCRI investigator "decided not to investigate" (*id.* at ¶¶ 39-43). Although Plaintiffs identify a "November 19 open forum" at which "students raised concerns regarding discriminator [sic] incidents," they provide no specifics about these incidents or who raised them to whom (*id.* at ¶ 42). These general, conclusory allegations are insufficient to plead a plausible policy of deliberate indifference.

Plaintiffs argue that rejecting their allegations as insufficient holds them to an unreasonable standard of "producing an audit[] outlining the specific number, nature, [and] specific type of complaints" and that "this case is only at the pleading stage prior to the initiation of discovery" (Dkt. 59 at 11). Although the Court agrees that the standard is not an "audit" of uninvestigated reports, Plaintiffs must still plead sufficient facts to make a claim plausible and may not avoid this obligation by asserting all conclusory allegations "on information and belief."

While the *Iqbal*/*Twombly* plausibility standard does not prevent a plaintiff from pleading alleged facts based on information and belief, *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017), Plaintiffs' repeated use of the phrase on "information and belief" infers they "likely lack[] knowledge of underlying facts to support the assertion and [are] instead engaging in speculation

to an undue degree." *See Delphix Corp. v. Actifo, Inc.*, No. C 13-4613 RS, 2014 WL 4628490, at *2 (N.D. Cal. Mar. 19, 2014) (rejecting reliance on repeated use of phrase "information and belief"). Further, Rule 8's pleading requirements prevent a plaintiff from filing a complaint to conduct a fishing expedition to uncover evidence. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009) ("Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."); *see also* Fed. R. Civ. P. 11(b) (requiring certification of evidentiary support for factual contentions).

### 3. Retaliation

Finally, John alleges a claim for retaliation under Title IX. To state a prima facie case for a Title IX retaliation claim, a plaintiff must allege that: (a) he was engaged in protected activity; (b) he suffered an adverse action; and (c) a causal link between the two exists. *MacIntyre v. Carroll Coll.*, 48 F.4th 950, 954 (9th Cir. 2022). At issue here is whether John has adequately alleged a causal link between his alleged protected activities—reporting sexual harassment—and the adverse actions he allegedly suffered. The Ninth Circuit has ruled that this causal link element is "construed broadly." *Emeldi v. Univ. of Or.*, 673 F.3d 1218, 1226 (9th Cir. 2012). In *Emeldi*, the Ninth Circuit articulated three circumstances that may show a causal link between the protected activity and the adverse action, including (1) the proximity in time between these events, (2) the alleged retaliating actor's knowledge of the protected activity, and (3) that the retaliator has "exhibited gender-based animus in other contexts." *Id.* at 1226-27. Regarding proximity, the Ninth Circuit has ruled that an eight-month gap between the protected activity and the adverse action is "too great to support an inference" of a causal link between the two events. *Id.* at 1226 n.3 (citing *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1035 (9th Cir. 2006)).

MEMORANDUM DECISION AND ORDER - 15

Here, John describes his protected activity as "reporting the sexual harassment . . . throughout 2021 and 2022" (Dkt. 55 at ¶ 61). John alleges that, as a result of these reports, he suffered the following adverse action: (1) the University "would not approve any programs John requested [to] allow all of his credits to transfer to a law school in Arizona";[3] (2) the University approved his transfer to its Boise campus but declined his request for a "cost-of-living-adjustment," forcing him to remain enrolled at the Moscow campus; (3) the University's Center for Disability Access and Resources (CDAR) demanded "substantial and invasive documentation" about John's disability before approving his accommodation request to attend classes remotely and then required him to reapply for the accommodation the next semester, although it later "abandoned" that requirement; and (4) Dean Tomlin notified John that his remote exam accommodation "did not include providing physical copies of the test," which required him to print the tests himself (Dkt. 55 at ¶¶ 62, 64-67, 69). For each of these allegations, John alleges "on information and belief" that the conduct was "a means of retaliating against [him] for his complaint." (Dkt. 55 at ¶¶ 61, 63, 64, 65, 67, 69, 70, 72) (alleging based on "information and belief").

John, however, fails to sufficiently allege a causal link between these retaliatory actions and his reports of sexual harassment. With one exception, John's reports are not proximate to the University's alleged retaliatory actions. In September 2021, John reported sexually harassing

---

[3]     John also alleges, however, that "the [American Bar Association] does not allow a student to transfer more than thirty law school credits to a new school, suggesting that perhaps this requirement constrained the University's approval (Dkt. 55 at ¶ 62).

conduct occurring at his apartment; then in April 2022, he reported conduct which occurred during the Moment of Community (*id.* at ¶¶ 17, 49). To the extent John's allegations identify a timeframe,[4] most of the alleged retaliation is not proximate to his reports. For example, John complains about the CDAR's conduct in or around January 2023 ("prior to the start of Spring 2023 semester") and about being notified his exam accommodation would not include a physical copy of the test in April 2023. These events are too remote to infer retaliation for John's reports of sexual harassment in September 2021 and April 2022. *See Emeldi*, 673 F.3d at 1226 n.3 (noting eight-month gap too great to infer retaliation); *Cornwell*, 439 F.3d at 1035 (same).

The only alleged retaliation which is proximate to John's reports of sexual harassment is the University's denial of his request for a cost-of-living-adjustment to allow him to attend school at the Boise campus (Dkt. 55 at ¶ 64). This denial occurred in May 2022, approximately a month after John reported sexually harassing conduct during the Moment of Community in April 2022 (*id.* at ¶ 17). John does not allege, however, that the individuals acting on the University's behalf who denied his request for a cost-of-living-adjustment either knew about his report or exhibited "gender-based animus" in another context. Absent the identity of the individual who denied John's request and allegations that the individual knew about John's reports or otherwise harbored gender-based animus, the Court declines to infer the University denied John's request for a cost-of-living adjustment in retaliation for his reports of sexually harassing conduct.

---

[4]    Many of John's allegations do not provide a timeframe for generally alleged conduct (*see, e.g.*, Dkt. 55 at ¶¶ 61-73) (alleging acts of retaliation).

Because Plaintiffs have failed to allege a plausible Title IX claim under any theory on behalf of any Plaintiff, the Court grants the University's motion to dismiss Counts One, Two, Three, and Six.

## B.    Title VI – Count Seven

Count Seven alleges race discrimination in violation of Title VI on behalf of Kelly (Dkt. 55 at ¶¶ 194-208). Title VI provides that "no person in the United States, shall on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Here, Kelly's allegations appear to rely on several theories in support of her Title VI claim including pre-assault liability, disparate treatment, and a racially hostile environment.

### 1.    Racially Hostile Environment

To state a claim for a racially hostile environment under Title VI, a plaintiff must allege that: "(1) there is a racially hostile environment; (2) the [defendant] had notice of the problem; and (3) it failed to respond adequately to redress the racially hostile environment." *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1033 (9th Cir. 1998). Additionally, to ultimately prevail on a Title VI claim, a plaintiff must prove intentional discrimination. *Yu v. Idaho State Univ.*, 15 F.4th 1236, 1242 (9th Cir. 2021). At the pleading stage, however, a Title VI plaintiff need only allege the defendant engaged in discrimination and does not need to plead intent. *Monteiro*, 158 F.3d at 1026.

In support of her claim that the University was deliberately indifferent to a racially hostile environment, Kelly alleges "students made multiple racist comments" during law school

orientation. Specifically, Kelly alleges that a student stated "Black people 'are jealous of blue eyes'" and "could be offended by the term 'ocean eyes'"; Kelly "observed racist treatment of a Latino student" when a professor commented that the student's "English was very good"; and Kelly heard a white student say to that same Latino student that "immigration law fits your demographics" (Dkt. 55 at ¶¶ 89-91).

Additionally, Kelly relies on comments which Professor David Pimentel made during a 2021 torts class. These comments included that Pimentel said to a Black student who raised his hand during a discussion about a case involving a car theft, "Oh, I bet you know all about car theft huh?" (Dkt. 55 at ¶ 92). On another occasion, Pimentel stated that "he might 'accidently slip and say the n-word during the lecture' because he [had] heard 'so much rap music' at a recent music convention" (*id.* at ¶ 94). Kelly and other students reported these comments to the Dean (*id.* at ¶¶ 93-95). After the reports, Kelly claims Pimentel treated her "and the other students of color noticeably colder than he did their White classmates"; called on her less; was less friendly; and used a "more monotone" voice when communicating with her (*id.* at ¶ 108).

Further, Kelly alleges that because of Pimentel's racially discriminatory comments, White students in the class "felt empowered" to make derogatory racial comments (*id.* at ¶¶ 101-02). She describes these comments as bringing up *Brown v. Board of Education* and stat[ing] Black people never wanted to end segregation"; stating "pets were property the same way that slaves had been property"; and commenting that "tort law should not protect a minority who cannot speak English and is in the United States illegally" (*id.*).

Kelly, however, acknowledges that on at least one occasion, Pimentel interrupted and cutoff a student making an inappropriate comment (*id.* at 102). Further, she acknowledges that

**MEMORANDUM DECISION AND ORDER - 19**

after she (or others) reported Pimentel's comments about the Black student knowing about car thefts and the use of the n-word in rap music, Pimentel apologized in class the next day (*id.* at 93, 95). In other words, it is evident from Kelly's allegations that the University at least reprimanded Pimentel for his comments. That the University addressed the issue with Pimentel undermines Kelly's assertion that it "foster[ed] a racially hostile environment" (*id.* at ¶ 95). Although Kelly complains the Dean did not report Pimentel's comments to the OCRI for investigation, she is not entitled to a particular remedy. *See Oden v. N. Marianas College*, 440 F.3d 1085, 1089 (9th Cir. 2006) ("An aggrieved party is not entitled to the precise remedy that he or she would prefer.").

Moreover, many of Kelly's allegations do not support her assertion of a racially hostile environment because they complain about events having no apparent racial connotation. For example, Kelly alleges she was the subject of false rumors that she egged a student's truck; a professor graded her exam incorrectly and refused to change her grade; and that same professor "stared" at her when he saw her in a restaurant (Dkt 55 at ¶¶ 103, 109-10). Kelly does not allege that any of this conduct occurred because of her race.

Further, Kelly does not allege anyone reported to the University several incidents of racially derogatory conduct about which she complains, including that the same CLS member who denigrated the Pride flag also denigrated the "Black Lives Matter" flag; students complained "about Black Lives Matter protests followed by abrupt silence when Kelly entered the room"; and "CLS students chant[ed] 'White power' during a lecture by a Black professor" (*id.* at ¶ 204). Because Kelly does not allege the University had notice of these events, they are insufficient to support a plausible Title VI claim.

MEMORANDUM DECISION AND ORDER - 20

Meanwhile, that conduct which was reported to the University and which could conceivably be construed as racially derogatory is not so "severe, pervasive or persistent" as to interfere with the educational program of a reasonable person in law school—particularly when compared to the conduct which courts have found sufficient to allege a plausible hostile environment. *See Monteiro*, 158 F.3d at 1033 (noting requirement of conduct so severe, pervasive, or persistent as to interfere with reasonable person's education) (quotations omitted). For example, in *Monteiro*, the school knew that its Black high school students were "repeatedly called 'nigger'" by other students and that "these insults were scrawled about the school in the form of graffiti." *Id.* at 1032. In *Patterson v. Hudson Area Schools*, 551 F.3d 438 (6th Cir. 2009), on which Kelly relies, the plaintiff was subject to name calling, including "fat, faggot, gay, queer, pig, and man boobs on a daily basis" for years during junior high and high school and was physically assaulted twice, including a sexual assault so egregious it resulted in the assaulting student's criminal conviction and expulsion. *Id.* at 440-43 (quotation marks omitted). In contrast to these cases and the others which Kelly cites, the conduct on which Kelly relies—although insensitive and unkind—is not so severe, pervasive, or persistent in nature to support a plausible Title IV, including when considered in the totality. *Monteiro*, 158 F.3d at 1033 (defining racial harassment to be "severe, pervasive or persistent").

## 2. Disparate Treatment

Kelly's allegations suggest she is also relying on a theory of intentional discrimination based on disparate treatment. To state a claim for disparate treatment, a plaintiff must allege that: (1) she is a member of a protected class; (2) the defendant treated her differently from similarly

situated individuals; and (3) her protected class status motivated this treatment. *Rashdan v. Geissberger*, 764 F.3d 1179, 1183 (9th Cir. 2014).

Kelly twice alleges that the University treated her differently than "similarly situated students who are not persons of color" (Dkt. 55 at ¶ 111; *see also* ¶ 206 (alleging University required documentation for remote access accommodation because of her "deteriorating mental health" but did not require same from "White colleagues")). These allegations, however, are conclusory and devoid of facts from which the Court could reasonably infer others were treated more favorably. For this reason, the Court concludes Kelly fails to state a Title VI claim of disparate treatment. *See Olson v. California,* 104 F.4th 66, 77 (9th Cir. 2024) (en banc) (affirming order granting motion to dismiss because "threadbare" allegation of another similarly situated class does not suffice).

### 3.  Pre-Assault Liability

Kelly also appears to rely on a theory of pre-assault liability to state a Title VI claim. For example, she alleges that the University allowed a "racially hostile environment" to exist "between 2011 and September 1, 2020" by receiving "numerous complaints of racial discrimination" but "refus[ing] or fail[ing] to conduct formal investigations of a majority of those complaints" (Dkt. 55 at ¶ 80). Further she alleges the University was aware of this environment based on a "Human Resources 2018 Climate & Culture report"; "racist rhetoric [appearing] in an online student chat forum in September 2019"; a student's question at a lecture in October 2019 about "whether genocide could pose a solution to climate change"; an "open forum" in November 2019 during which "students raised concerns regarding discriminatory incidents"; and a law school professor's 2019 race discrimination lawsuit (*id.* at ¶¶ 81-86). Based on these allegations, Kelly asserts there

was "a University sanctioned racially hostile environment" when she started law school in August 2021 (*id.* at ¶¶ 5, 88).

Kelly, however, cites no authority that a plaintiff may allege and prove a Title VI under a theory of pre-assault lability, and the Court is not aware of any such authority. Indeed, because Kelly would eventually have to prove the University's intent to discriminate against her, the theory is likely not a viable theory to establish a Title VI claim. *See Yu*, 15 F.4th at 1242 (providing plaintiff must prove intentional discrimination to ultimately prevail on Title VI claim). Accordingly, Kelly's allegations about the University's racially hostile environment before she began law school are insufficient to state a plausible Title VI claim.

Because Kelly fails to allege a plausible Title VI under a theory of pre-assault liability, disparate treatment, or a racially hostile environment, the Court dismisses Count Seven.

## E.    Rehabilitation Act and ADA – Counts Four, Five, Eight, and Nine

Plaintiffs' Counts Four, Five, Eight, and Nine allege disability discrimination in violation of the Rehabilitation Act and Title II of the ADA on behalf of Kelly and John (Dkt. 55 at ¶¶ 162-178, 209-28). Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To state a Title II claim, a plaintiff must allege: (1) he is a qualified individual with a disability; (2) he was either excluded from participation in or denied the benefits of a public entity's service, program, or activity, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability. *See id.*; *Weinreich v. Los Angeles Cnty. Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997).

MEMORANDUM DECISION AND ORDER - 23

Similarly, under § 504 of the Rehabilitation Act, a plaintiff must allege: (1) he is an "individual with a disability"; (2) he is "otherwise qualified" to receive the benefit; (3) he was denied the benefits of the program solely by reason of his disability; and (4) the program receives federal financial assistance. *Weinreich*, 114 F.3d at 978. The analysis of a claim under the Rehabilitation Act and the ADA is the same. *Csutoras v. Paradise High School*, 12 F.4th 960, 969 n.11 (9th Cir. 2021) (noting no significant difference in analysis of rights and obligations ADA and Rehabilitation Act create).

In the educational context, the Ninth Circuit has described the prima facie case of discrimination based on a disability in violation of both the ADA and the Rehabilitation Act as showing that: (1) the plaintiff is disabled as the Acts define that term; (2) the plaintiff is qualified to remain a student at the school, meaning the plaintiff can meet the essential eligibility requirements of the school with or without reasonable accommodation; (3) the plaintiff was dismissed solely because of a disability; and (4) the school receives federal financial assistance (for the Rehabilitation Act claim) or is a public entity (for the ADA claim). *Zukle v. Regents of the Univ. of California,* 166 F.3d 1041, 1045 (9th Cir. 1999); *see also Wong v. Regents of U. of California*, 192 F.3d 807, 816 (9th Cir. 1999) (same).

John alleges he is a qualified individual with a disability because he has been diagnosed with dyslexia, post-traumatic stress disorder (PTSD), and a bone degenerative disease (Dkt. 55 at ¶ 74). Kelly, likewise, alleges she is a qualified individual with a disability because she has been diagnosed with depression, anxiety, PTSD, and adjustment disorder (*id.* at ¶ 115). Both acknowledge they requested and were granted approval to attend classes remotely as an accommodation for their disabilities (*id.* at ¶¶ 75, 116). Both, however, complain they were "not

able to access and participate in the educational opportunities provided to [their] non-disabled peers" and were "excluded from participation in [their] law school classes by reason of [their] disability" because of "technical failures" with their remote access "that professors refused to address" and because of "professors' refusal to allow [them] to participate in class discussions" (*id.* at ¶¶ 75, 117).

Neither John nor Kelly allege that they were "dismissed" from the University solely because of their disability, however. Instead, John "graduated in winter 2023," and Kelly "graduated in spring 2024" (*id.* at ¶¶ 5-6). That John and Kelly successfully graduated is fatal to their claims. *See Zukle*, 166 F.3d at 1045 (noting dismissal solely because of disability as element of prima facie case); *Wong*, 192 F.3d at 816 (same). Moreover, their allegations fail to state a plausible claim for disability discrimination for other reasons. One reason is that they acknowledge the University granted them their requested accommodation, i.e., remote class attendance (*id.* at ¶¶ 75, 114).

Another reason is that the law requires only a reasonable accommodation and not a perfect one. *See Marie v. Arizona Dep't of Econ. Serv.*, No. CV-17-03167-PHX-DJH, 2020 WL 977932, at *4 (D. Ariz. Feb. 28, 2020) (providing "courts do not interpret the ADA as requiring a *perfect* accommodation" and citing cases). Educational institutions are only required to provide accommodations that are *necessary* to enable an individual with disabilities to meet the standards of the program in question. *Wong*, 192 F.3d at 818. Although John and Kelly complain about "technical difficulties" and a lack of participation in class discussions while attending via remote access, those aspects of their remote access accommodation obviously did not prevent them from meeting the standards for graduation. Further, although Kelly complains that the University did

MEMORANDUM DECISION AND ORDER - 25

not grant her permission to attend a trial advocacy class remotely, that class was obviously unnecessary to her successful graduation.

Finally, Plaintiffs' reliance on *Wright v. New York State Dep't of Corr.*, 831 F.3d 64 (2d Cir. 2016), to argue the University was required to provide more meaningful remote access is misplaced. In that case, the Second Circuit addressed whether the prison's "mobility assistance program," provided to a prisoner with severely deformed legs, in lieu of a motorized wheelchair, allowed meaningful access to prison services, programs, and activities. *Id.* at 68. The Court ruled that "a reasonable accommodation must provide effective access to prison activities and programs" and that "the accommodation must overcome structural impediments and non-trivial temporal delays that limit access to programs, services, and activities." *Id.* at 73. These rules, however, have no application in this case where the University granted Plaintiffs' requested accommodation to attend classes remotely.

Because John and Kelly have failed to state a plausible claim under either the Rehabilitation Act or the ADA, the Court dismisses Counts Four, Five, Eight, and Nine.

## IV.   ORDER

IT IS ORDERED that:

1. The University's Motion to Dismiss (Dkt. 58) Plaintiffs' Second Amended Complaint is **GRANTED**.

2. The Court **DISMISSES this case in its entirety WITH PREJUDICE** and will issue a separate judgment.

DATED: September 04, 2025

*Amanda K. Brailsford*

Amanda K. Brailsford
U.S. District Court Judge

**MEMORANDUM DECISION AND ORDER - 26**